In re ENRON CREDITORS RECOVERY CORP., et al., Reorganized Debtors.

Enron Creditors Recovery Corp., et al., Plaintiff,

v.

J.P. Morgan Securities, Inc., et al., Defendants.

Enron Creditors Recovery Corp., et al., Plaintiff,

v.

Mass Mutual Life Insurance Co., et al., Defendants.

Bankruptcy No. 01 B 16034(AJG). Adversary Nos. 03–92677 A, 03–92682 A.

United States Bankruptcy Court, S.D. New York.

June 29, 2009.

Michael Schatzow, Esq., Venable LLP, Baltimore, MD, Robert L. Wilkins, Esq., Colleen M. Mallon, Esq., Washington, DC, Special Litigation Counsel for Enron Creditors Recovery Corp., et al.

Howard P. Magaliff, Esq., Togut, Segal & Segal, LLP, New York, NY, Co–Counsel for Enron Creditors Recovery Corp.

Sabin Willett, Esq., Mark M. Elliot, Esq., Eric A. Heining, Esq., Bingham McCutchen LLP, Boston, MA, Counsel for ING VP Balanced Portfolio, Inc., ING VP Bond Portfolio, and Aeltus Investment Management, Inc.

Michael L. Cook, Esq., Victoria A. Lepore, Esq., Schulte Roth & Zabel LLP, New York, NY, Counsel for Alfa, S.A.B. de C.V.

Katharine B. Gresham, Esq., Securities and Exchange Commission, Washington, D.C.

## OPINION CONCERNING MOTIONS FOR SUMMARY JUDGMENT

ARTHUR J. GONZALEZ, Bankruptcy Judge.

The issue presented concerns whether the 11 U.S.C. § 546(e) safe harbor, which shields settlement payments from avoidance actions, extends to a transaction in which commercial paper is redeemed by the issuer prior to maturity. The Court finds that, where commercial paper is redeemed by the issuer prior to maturity, thereby extinguishing the commercial pa-

per, and when the payment made for that commercial paper is equal to the principal plus the accrued interest to the date of payment, the payment made by the issuer is for the purpose of satisfying the underlying debt. The Court concludes that because the payment would be for the retirement of the underlying debt, it would not be for a sale of the commercial paper to the issuer and the payment would not be a settlement payment. The Court further concludes that such a transfer would not be protected by the 11 U.S.C. § 546(e) safe harbor provided for settlement payments. Moreover, because the commercial paper was redeemed prior to its maturity date, and not as it customarily is at maturity, it would not be protected by the 11 U.S.C. § 547(c)(2) ordinary course of business defense.

### FACTS

Commencing on December 2, 2001, and from time to time continuing thereafter, Enron Corporation ("Enron") and certain of its affiliated entities, (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On July 15, 2004, the Court entered an Order confirming the Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan") in these cases. The Plan became effective on November 17, 2004 and the Debtors emerged from chapter 11 as reorganized debtors. Effective March 1, 2007,

Enron changed its name to Enron Creditors Recovery Corp. Thereafter, on April 4, 2007, an order was entered authorizing the change of the caption of the reorganized debtors' cases.[1]

In 2003, Enron filed a complaint commencing an adversary proceeding against J.P. Morgan Securities, Inc. ("JP Morgan") and various other defendants, and filed a separate complaint commencing an adversary proceeding against Mass Mutual Life Insurance Company and various other defendants. In each adversary proceeding, Enron sought to avoid and recover certain transfers made to the defendants that it alleged were preferential or otherwise avoidable. On December 1, 2003, Enron filed amended complaints with respect to each of the adversary proceedings (each individually, as amended, the "Complaint" and together, the "Complaints").

In the Complaints, Enron sought to recover transfers made by Enron between October 26 and November 6, 2001, totaling in excess of $1.1 billion. Prior to the petition date, Enron issued and sold unsecured commercial paper to various entities. The commercial paper was uncertificated and had maturities of up to 270 days. The significance of certificates not having been issued to monitor its ownership is that the ownership of the commercial paper is then tracked by "bookkeeping" entries in a computer system at The Depository Trust Company ("DTC"), a clearing agency. This tracking method is customary in the industry.[2] The DTC is used to process the

---

1. For convenience, hereinafter, all references to Enron signify either Enron, the Debtors, the reorganized debtors, or Enron Creditors Recovery Corp., as the context requires.

2. [The DTC] ... was created to reduce costs and provide clearing and settlement efficiencies by immobilizing securities and making "book-entry" changes to ownership of securities. DTC provides securities movements for [the National Securities

Clearing Corporation's (NSCC's)] net settlements, and settlement for institutional trades (which typically involve money and securities transfers between custodian banks and broker/dealers), as well as money market instruments.
The Depository Trust Company (DTC), http://www.dtcc.com/about/subs/dtc.php (last visited June 23, 2009).

flow of debits and credits associated with commercial paper payments and the retirement of the numbers associated with the commercial paper when it is redeemed. Thus, the DTC only provides a bookkeeping function for the flow of commercial paper.

Pursuant to Issuing and Paying Agency Agreements between Enron and J.P. Morgan Chase Bank and its predecessors in interest (collectively, the "Chase IPA"), the Chase IPA served as issuing and paying agent in connection with Enron's commercial paper. Any issuer of commercial paper needs an issuing and paying agent within the DTC to issue the commercial paper and to pay for the commercial paper at maturity, or prior to maturity if the paper is redeemed early. The DTC does not permit an issuing and paying agent for commercial paper to participate in a "secondary trade" of a security and instead requires the early retirement of commercial paper to be processed as a "prepayment."

The purchase and sale of Enron's commercial paper, including each commercial paper note identified in the amended complaints, was made pursuant to terms set forth in an Offering Memorandum, dated September 14, 2001. The Offering Memorandum provided as follows: "The [n]otes are not redeemable or subject to voluntary prepayment by [Enron] prior to maturity."

JP Morgan acquired the Enron commercial paper for its own account, as a market maker, and on behalf of its respective customers, as a dealer.[3] The source of the notes evidencing the commercial paper

that the customers purchased through one of the broker/dealers was either Enron itself or other holders of outstanding Enron commercial paper who sold certain of their holdings before maturity. JP Morgan documented its and its customers' purchases of Enron commercial paper through trading confirmation records (the "Confirmations"). The payments for the purchases were made through the DTC.

Enron had access to two lines of credit totaling $3 billion that had been made available to it by two bank syndicates. One was a $1.75 billion revolver agreement with a syndicate of various banks, and the other was a $1.25 billion long-term credit agreement with another bank syndicate. Enron could draw funds on these lines of credit to pay off maturing commercial paper and to meet its other daily cash needs. The credit facility agreements authorized Enron to use the proceeds of the lines of credit for any "general corporate purposes."

In the Complaints, Enron maintains that the transfers it made between October 26 and November 6, 2001 were for the purpose of paying, prior to their maturity date, the notes that had been previously issued by Enron. As Enron paid approximate accrued par value[4] for the commercial paper notes, which was significantly more than their market value, Enron characterized the payments as being made for the early redemption of the commercial paper notes. In the Complaints, Enron delineated the individual transfers that it sought to avoid against the various defendants in each of the actions.[5]

---

3. With respect to certain defendants that have reached settlements and been dismissed from these actions, Goldman, Sachs & Co. and Lehman Commercial Paper Inc. played a role similar to that of JP Morgan.

4. The approximate accrued par value paid was the price originally paid for the commercial paper plus accrued interest.

5. Enron did not seek to avoid those payments that were made at maturity, during the preference period, because it determined that al-

In the Complaints, Enron alleged that, prior to making the transfers, some or all of the defendants in each of the adversary proceedings were aware that the transfers might be subject to avoidance because the dealers that facilitated the transactions had informed them that these transfers could be subject to avoidance as preferential transfers.

In Count I of the each Complaint, Enron seeks avoidance of the transfers as preferential payments under section 547(b) of the Bankruptcy Code.[6] In Count III of each Complaint, Enron seeks avoidance of the transfers as fraudulent conveyances under section 548(a). In Count V of each Complaint, Enron seeks avoidance of the transfers as fraudulent, pursuant to section 544(b) and any applicable state fraudulent conveyance or transfer law. In Counts II, IV and VI of each Complaint, Enron seeks recovery, pursuant to section 550, of the transfers that are deemed avoided, under Counts I, III and V of the respective Complaints, as preferential transfers or fraudulent conveyances or transfers. In Count VII of each Complaint, Enron seeks disallowance of any claims of each defendant against Enron unless and until such defendant turns over, or pays the value, to Enron of any transferred property for which the defendant is determined to be liable to Enron pursuant to section 550.

On June 15, 2005, the Court issued an Opinion concerning motions to dismiss that had been lodged by substantially all of the original defendants. *Enron Corp. v. J.P. Morgan Secs., Inc. (In re Enron Corp.)*, 325 B.R. 671 (Bankr.S.D.N.Y.2005). In its June 15, 2005 Opinion, the Court denied the motions to dismiss. *Id.* at 687. The Court concluded that to qualify as a settlement payment protected from avoidance by section 546(e), the payment must be common in the securities trade, which was a factual issue requiring a trial. *Id.* at 686. Further, the Court concluded that evidence was required regarding whether the transfers were a result of the defendants' manipulation. *Id.* The Court further determined that a trial was required to resolve the factual issue of whether the transfers were made to repurchase the notes or to retire the debt represented by the notes and that if, after trial, it was found that the payments were to retire and extinguish the debt, the Court would need to address the issue of whether such payments qualify as settlement payments for purposes of section 546(e). *Id.* In addition, even if the payments were to repurchase the notes, the Court concluded that it would have to address the issue of whether the short-term commercial paper at issue qualifies as a security within the scope of section 546(e). *Id.*

Thereafter, certain defendants filed motions in the district court seeking leave to file an interlocutory appeal. They also sought to have the reference of the adversary proceedings to this Court withdrawn. The defendants argued, *inter alia,* that the question of whether short-term paper qualifies as a security within the scope of section 546(e) might require substantial interpretation of the securities laws. The district court denied those motions and, specifically with reference to the withdrawal, concluded that the securities law issues might not have to be reached if certain determinations were made by this Court. *Enron Corp. v. JP Morgan Secs.,*

---

though such payments would not be protected by the 11 U.S.C. § 546(e) safe harbor, they nonetheless would be protected from avoidance by the "ordinary course of business" defense provided by 11 U.S.C. § 547(c)(2).

**6.** Hereinafter, unless otherwise indicated, all references to sections are to the Bankruptcy Code.

*Inc. (In re Enron Corp.),* No. M–47, 2008 WL 281972 at * 6 (S.D.N.Y. Jan. 25, 2008).

After Enron's submission of its expert reports, which set forth certain securities law issues, former defendant Goldman Sachs & Co. filed a motion in the district court seeking to have the reference withdrawn, arguing that resolution of the adversary proceedings required substantial and material consideration of the federal securities laws. The district court concluded that the theory seeking to hold the broker/dealers liable as beneficiaries of the transfers, based upon the elimination of their liability under certain securities laws, required substantial interpretation of the interplay of various securities laws. *Enron Corp. v. J.P. Morgan Secs., Inc. (In re Enron Corp.),* 388 B.R. 131, 140 (S.D.N.Y. 2008). While the district court concluded that it was within its jurisdiction to reach any such issue, it also concluded that if certain determinations were made by this Court, it would preclude the necessity of reaching any such issue. *Id.* at 141–42. Therefore, it returned the matter to this Court with the instruction that if, ultimately, it proved necessary to reach securities law issues, withdrawal of the reference would be appropriate. *Id.* at 142.

Thereafter, most of the nearly 200 defendants in the adversary proceedings moved for summary judgment in mid–2008. The vast majority of the defendants in both actions reached a settlement with Enron and have been dismissed from the action. The four remaining defendants are ING VP Balanced Portfolio (the "Balanced Fund"), a mutual fund; Aetna Bond VP (the "Bond Fund" and, together with the Balanced Fund, the "ING Funds"), a mutual fund; Aeltus Investment Management, Inc. ("Aeltus"), an investment advisor; and Alfa S.A.B. de C.V. ("Alfa," and together with the ING Funds, the "Investors"), a Mexican holding company whose treasury department invests the corporate cash reserves of Alfa's component businesses.

The Balanced Fund, which invests in equities and fixed-income securities, and the Bond Fund, which invests primarily in fixed-income securities, are both registered with the Securities Exchange Commission (the "SEC") as investment companies under the Investment Company Act of 1940.

Aeltus, which engages in investment transactions for the accounts of the ING Funds, is registered with the SEC as an investment advisor under the Investment Advisers Act of 1940. Aeltus, which is a separate legal entity from the ING Funds, is responsible for managing the assets of the ING Funds and making investment decisions for those Funds consistent with their respective investment objectives and policies. Aeltus does not receive a commission or other form of payment in connection with the particular transactions. Rather, the ING Funds each pay Aeltus a management fee based upon the value of the assets that Aeltus manages. At no time does Aeltus obtain legal ownership of any of the ING Funds' assets.

The Investors engaged in transactions with JP Morgan in mid-September or mid-October 2001 to acquire commercial paper issued by Enron and then transferred the commercial paper to JP Morgan in late October, prior to their respective maturity dates. The transactions were conducted through custodial bank accounts at the DTC. On the same day that the commercial paper was transferred from the Investors to JP Morgan, JP Morgan transferred that same commercial paper to Enron's Chase IPA account at the DTC and Enron paid JP Morgan, again through the DTC. Immediately upon the payment to JP Morgan, the commercial paper was extinguished. Previously, on October 25, 2001,

Enron had drawn down $3 billion from its revolving credit lines and those funds were used to finance the payments Enron made for the commercial paper transactions.

The specific transactions involving the ING Funds were orchestrated by Aeltus. On October 16, 2001, Aeltus entered into an agreement for the benefit of the Balanced Fund to buy from JP Morgan certain commercial paper (the "Balanced CP") issued by Enron in the principal amount of $23,216,000.00, with the purchase price being $23,157,024.91. The stated maturity date of the Balanced CP was November 16, 2001. In addition, on October 16, 2001, Aeltus entered into an agreement, for the benefit of the Bond Fund, to buy from JP Morgan certain commercial paper (the "Bond CP") issued by Enron in the principal amount of $25,000,000.00, with the purchase price being $24,936,493.06. The stated maturity date of the Bond CP was also November 16, 2001. At the time of both of these transactions, the payments made to JP Morgan were debited from the custodial bank account used for the ING Funds at the DTC. In addition, the commercial paper was credited to that account.

On October 26, 2001, Aeltus entered into an agreement to transfer, for the benefit of the Balanced Fund, the Balanced CP for $23,181,756.40. In addition, on October 26, 2001, Aeltus entered into a similar agreement, for the benefit of the Bond Fund, to transfer the Bond CP for $24,963,125.00. On the morning of October 29, 2001, the commercial paper was transferred to JP Morgan. Certain evidence presented to the Court indicates that Aeltus had been informed that JP Morgan was acting as agent for Enron and that Enron was retiring its commercial paper. The commercial paper for the ING Funds was debited from the custodial bank's DTC accounts used for the ING Funds and the payments from JP Morgan were credited to those accounts. The payments from JP Morgan were debited from JP Morgan's account and the commercial paper was credited to its account at DTC. Later that same day, JP Morgan transferred, through the DTC, the same commercial paper that it had received from the ING Funds to Enron's Chase IPA account where, upon the payment by Enron to JP Morgan's account at DTC, the commercial paper was immediately extinguished. Assuming that JP Morgan was acting as agent,[7] had the latter transactions not been consummated, the earlier transactions between the ING Funds and JP Morgan would have been unwound and the earlier debits and credits reversed. Prior to the final transfers between JP Morgan and Enron, the ING Funds could have used the credits in their custodial accounts at the DTC to effect certain transfers with other entities with DTC custodial accounts within the DTC system. However, the ING Funds could not withdraw the value from the DTC system to put the funds to their own use until the final transfers were completed.

In 2001, Alfa's treasurer was responsible for investing approximately $200 million of Alfa's cash reserves in various commercial paper obligations. The criteria utilized for such investments were the commercial paper's credit rating, expiration, and yield. On September 17, 2001, Alfa purchased approximately $5.6 million of Enron commercial paper from JP Morgan, as the commercial paper met the required ratings guidelines. Alfa's usual policy was to purchase commercial paper only on the secondary market from broker/dealers and not directly from the issuer.

---

7. If JP Morgan were acting as Enron's agent, a transfer from JP Morgan to an investor would have required a commensurate payment to JP Morgan from Enron, as principal.

On October 29, 2001, Alfa transferred the Enron commercial paper to JP Morgan, one day prior to its maturity date.[8] Comparable to the ING Funds' transactions, the DTC accounts of the parties were similarly debited and credited. Later that same day, JP Morgan transferred the commercial paper to Enron's Chase IPA account at DTC where, upon the payment by Enron to JP Morgan's account at the DTC, the commercial paper was immediately extinguished. Alfa's treasurer alleges that he agreed to the transfer after having received an unsolicited telephone call from a JP Morgan representative, who inquired as to Alfa's willingness to transfer the Enron commercial paper. In September 2001, Alfa also sold its commercial paper holdings in seven other companies prior to maturity.[9]

### Parties' Arguments

The Investors contend that the payments from JP Morgan for the commercial paper were made to complete securities transactions and that, as such, they were settlement payments protected from avoidance by section 546(e). The Investors argue that the transactions with JP Morgan were secondary market transactions, in which JP Morgan acted as principal, and that JP Morgan subsequently entered into separate transactions with Enron. The Investors maintain that their transactions with JP Morgan, as principal, were precisely the type of securities market transactions that the safe harbor was intended to protect against avoidance. Further, the Investors argue that even if JP Morgan acted as an agent, it was not a conduit because the transactions they engaged in with JP Morgan were concluded in the morning and JP Morgan conducted separate transactions later that same day with Enron. As such, the ING Funds argue that the avoidance provisions do not apply as they did not receive "an interest of the debtor in property." Specifically, the ING Funds contend that they received JP Morgan's property and not Enron's property because the transaction in which they received cash from JP Morgan from the transfer of Enron commercial paper had concluded in the morning, prior to the time that JP Morgan initiated its transaction with Enron. They further argue that it was only in the subsequent transfer of the commercial paper by JP Morgan to Enron that Enron funds were transferred to JP Morgan. Therefore, they contend that only JP Morgan received Enron's funds after JP Morgan had already concluded the transaction with the ING Funds, and that the ING Funds did not receive Enron's property. Finally, the Investors argue that they are protected by the earmarking defense. In addition to the arguments made by the Investors, Aeltus argues that it was not a transferee of the funds or an entity for whose benefit the funds were transferred, precluding Enron from recovering from it under section 550(a).

Enron argues that it redeemed its commercial paper and that JP Morgan merely acted as an agent in these transactions. Enron maintains that the transfers were payments for the early redemption of the notes. Enron further maintains that it

---

8. Enron does not challenge the contention that had the parties waited until the maturity date, the payment would have been protected from avoidance. This protection, however, would have been afforded by the section 547(c)(2) ordinary course of business defense and not by the section 546(e) safe harbor defense.

9. There is no indication that the commercial paper in these seven other companies was redeemed by the respective issuers, as opposed to being held by the broker/dealer until maturity or sold in the secondary market.

prepaid and redeemed the commercial paper by making full payment prior to its maturity. The payments were made at par, which was significantly more than the prevailing-market price at the time of the transfers. Therefore, Enron argues that the transfers, made for early redemption of commercial paper at significantly above-market price, were not "settlement payments" commonly used in the securities trade as required by section 546(e). Enron argues that the transfers were not to settle securities trades but, rather, were to prepay debt similar to the manner in which any borrower repays the principal and interest on a loan. At a minimum, Enron argues that evidence must be presented for the Court to determine whether the prepayment of commercial debt is ordinary or routine. Enron also argues that the safe harbor only extends to qualifying "purchases" and "sales" of securities, not to the payment or retirement of debt. Enron argues that the actual "ownership" of the instrument must transfer from seller to buyer. Here, there was no trade or exchange of ownership of a security but, rather, the payment of a debt which extinguished the instrument. In addition, Enron contends that the safe harbor protection does not apply to the commercial paper because the question of whether it qualifies as a security, within the scope of section 546(e), is made by reference to the securities trade which does not recognize short-term commercial paper as a security. More specifically, Enron maintains that short-term debt instruments issued for the purpose of funding current operations, and not for investment, are not commonly recognized as securities by the securities trade.

With respect to Aeltus, Enron argues that Aeltus benefitted from the payment because if the transfer had not been made, and Enron had then defaulted on the commercial paper at maturity, Aeltus would have been subject to liability from the investors in the ING Funds. Enron contends that because the payment relieved Aeltus from this liability, Aeltus benefitted from the transfer.

Pursuant to section 1109(a), which allows the SEC to raise an issue or appear and be heard on an issue in a case under chapter 11, the SEC appeared in support of the motions for summary judgment. The SEC argued that as long as commercial paper is processed through the normal securities clearance settlement processes for commercial paper, the safe harbor protections apply regardless of whether commercial paper is retired prior to maturity.[10] While not taking a position on whether the redemption or retirement of commercial paper at maturity would qualify for protection under the section 546(e) safe harbor, the SEC argues that the redemption of the commercial paper at issue is protected because the issuer did not have an absolute right to redeem the commercial paper prior to maturity. Rather, the issuer had to reach an agreement with the holder of the commercial paper to induce the holder to part with the commercial paper in order to enter into the transaction. As such, the SEC contends that the transaction should be viewed as a two-step process where the holders sold the commercial paper to Enron and, thereafter, Enron had the commercial paper extinguished.

10. The SEC also viewed section 546(e) as applying to settlement payments by or to protected entities regardless of whether those payments are made in connection with a trading transaction that itself implicates the guarantees of the clearance and settlement system process, and argued that commercial paper notes are securities for purposes of the Bankruptcy Code and section 546(e).

*Summary Judgment Motions*

Since the Court's ruling concerning the motions to dismiss, the parties have engaged in extensive discovery and, as previously stated, the motions for summary judgment were filed. A hearing (the "Hearing") concerning the summary judgment motions for the four remaining defendants was conducted on April 7, 2009. At the Hearing, the remaining defendants continue to argue that the section 546(e) safe harbor shields the transfers at issue from avoidance. They also contend that the avoidance sections are not applicable to the transfers at issue because the transfers were not of "an interest of the debtor in property." Finally, the defendants argue that the earmarking doctrine protects the transfers from avoidance. The SEC supports the defendants' view that the transfers were settlement payments protected by the section 546(e) safe harbor.

Enron opposes the motions for summary judgments and again argues that the transfers at issue were not settlement payments protected by section 546(e). Enron maintains that the payments were not for the purchase and sale of a security but were made to redeem the commercial paper and satisfy the underlying debt obligation. Enron contends that the transfers could not be normally regarded as part of the settlement process because they were not settlement payments commonly used in the securities trade. Enron also argues that the earmarking principle is not applicable to the facts in this case.

## DISCUSSION

*Summary Judgment Standard*

Fed.R.Civ.P. 56(c) incorporated into bankruptcy practice by Fed. R. Bankr.P. 7056 provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c) specifies that to preclude summary judgment, the fact in dispute must be material. Substantive law determines the facts that are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). If a fact is material, it is then necessary to see if the dispute about that material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12. If the fact may be reasonably resolved in favor of either party, then there is a genuine factual issue that may only be resolved by the trier of facts and summary judgment will be denied. *Id.* at 250, 106 S.Ct. at 2511, 91 L.Ed.2d at 213. If, however, the evidence "is so one-sided that one party must prevail as a matter of law," then summary judgment will be granted. *Id.* at 251–52, 106 S.Ct. at 2512, 91 L.Ed.2d at 214. On considering a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142, 155 (1970).

After the non-moving party to the summary judgment motion has been afforded a sufficient time for discovery, summary judgment must be entered against it where it fails to make a showing sufficient to establish the existence of an element essential to its case and on which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986). It is said that there is no genuine issue concerning any material fact because "a complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552, 91 L.Ed.2d at 273. In this manner, the summary judgment standard is similar to the directed verdict standard under Fed. R.Civ.P. 50(a). *Id.* at 323, 106 S.Ct. at 2552, 91 L.Ed.2d at 273–74.

The summary judgment standard is interpreted in a way to support its primary goal of "dispos[ing] of factually unsupported claims or defenses." *Id.* at 323–24, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. The summary judgment movant meets its burden by " 'showing' . . . that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. at 2554, 91 L.Ed.2d at 275. Application of the summary judgment procedure is not a disfavored procedural shortcut, but an integral part of the Federal Rules where there are no triable factual issues. *Id.* at 327, 106 S.Ct. at 2555, 91 L.Ed.2d at 276.

### Avoidance Powers

The Bankruptcy Code provides a trustee or debtor-in-possession with the power to avoid certain transfers "of an interest of the debtor in property" and to bring that value back into the bankruptcy estate for ratable distribution to all allowed creditors. Section 547(b) concerns the avoidance of payments made 90 days before the bankruptcy filing,[11] which prefers one creditor over the others. Section 548 allows for the avoidance of transfers that are actually fraudulent (section 548(a)(1)(A)) or are deemed to be constructively fraudulent (section 548(a)(1)(B)).

### Safe Harbor Provisions

Section 546(e) of the Bankruptcy Code provides a "safe harbor" for certain types of transfers by protecting the described transfers from avoidance actions.[12] Section 546(e) provides that

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

Section 548(d)(2)(B) provides, in relevant part, that

a . . . stockbroker, financial institution, or securities clearing agency that receives a . . . settlement payment, as defined in section . . . 741 of this title, takes for value to the extent of such payment.

11 U.S.C. § 548(d)(2)(B).

■ Thus, section 546(e) and section 548(d)(2)(B) provide a safe harbor for settlement payments. The purpose of section 546 is "to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions." *Kaiser Steel Corp. v. Charles Schwab & Co., (In re Kaiser Steel Corp.)*, 913 F.2d 846, 848 (10th Cir.1990) (hereinafter, *"Kaiser I"*). A settlement payment is a payment made to discharge a settlement obligation. *See Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.)*,

---

**11.** If the transfer were made to an insider, this period would extend to one year.

**12.** Section 546(e) was amended in 2006, however, that amendment does not apply to this matter. Moreover, even if the 2006 amendment were intended to clarify that section 546(e) applies to commercial paper when there is a purchase and sale of commercial paper, nevertheless, as discussed subsequently, section 546(e) does not apply to the redemption of commercial paper.

952 F.2d 1230, 1238 (10th Cir.1991) (hereinafter, *"Kaiser II"*) (citing Division of Market Regulation, Securities and Exchange Commission, *The October 1987 Market Break* at 10–5 (1988) (SEC Report)).

The routine purchase and sale of a security includes two opportunities for settlement, "street-side settlement" between the brokers and the clearing agencies, and "customer-side settlement" between the broker and its customer. *See Kaiser II,* 952 F.2d at 1237–38. The proper functioning of the system depends on the "guarantees of performance made by all the parties in the chain affirming that they will honor their obligations despite a default by another party in the system." *See Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.),* 263 B.R. 406, 476 n. 47 (S.D.N.Y.2001).

█ In enacting the section 546(e) exception to the avoidance powers, the goal was to preserve the stability of these settled transactions to the extent that they are not fraudulent as defined in section 548(a)(1)(A). *Id.* at 477. If settled transactions could be reversed, it would undermine confidence in the system of guarantees and could lead to the "ripple effect" of bankruptcy filings by other participants in the chain of guarantees. *Id.* The purpose of section 546(e) was "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *Jewel Recovery, L.P. v. Gordon (In re Zale Corp.),* 196 B.R. 348, 353 (N.D.Tex.1996) (quoting, H. Rep. No. 420, 97th Cong.2d Sess. 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583).

When first enacted, section 546 only applied to the commodities market. However, in 1982, its scope was expanded to protect the securities market. *Kaiser I,* 913 F.2d at 848–49. In connection with the securities trade, "settlement payment" is defined in section 741(8), which provides that

> "settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.

11 U.S.C. § 741(8).

This Court previously considered the arguments concerning the breadth of the term "settlement payment" and concluded that because the definition merely lists types of settlement payments, the reference in section 741(8) to "or any other similar payment commonly used in the securities trade" provided a basis upon which to circumvent the circularity of the definition and discern the meaning of the term "settlement payment." *Enron Corp.,* 325 B.R. at 685 (citing, *Enron Corp. v. Bear Stearns Int'l Ltd. (In re Enron Corp.),* 323 B.R. 857, 865, 870 (Bankr.S.D.N.Y.2005)). In *Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.),* 321 B.R. 527, 538 (9th Cir. BAP 2005), the bankruptcy appellate panel determined that the clause made clear that to come within the definition, the payment must be "restricted to the securities trade and must be 'commonly used.'" *Grafton Partners,* 321 B.R. at 538.

Even where a broad interpretation has been ascribed to the term "settlement payment," it has been observed that the term must be interpreted as it is "plainly understood within the securities industry." *See Kaiser II,* 952 F.2d at 1237; *see also Official Comm. of Unsecured Creditors v. ASEA Brown Boveri, Inc. (In re Grand Eagle Cos., Inc.),* 288 B.R. 484, 492 (Bankr. N.D.Ohio 2003) (noting that the term "settlement payment" has been characterized

as a technical word or term of art which requires reference to the industry usage of the term at the time of enactment); *Adler,* 263 B.R. at 475 (noting that it is clear that the provision is to be "defined with reference to the common understanding, practice and usage in the securities industry"). As such, to discern whether a payment is protected by the safe harbor provisions, a court must examine the operation of trades in the securities industry. *Grafton Partners,* 321 B.R. at 538.

▬ In the Opinion concerning the previous motions to dismiss filed in these adversary proceedings, the Court concluded that because the section 546(e) safe harbor only protects from avoidance those settlement payments that are "commonly used in the securities trade" and because, on a motion to dismiss, the Court accepts Enron's allegations as true,

> evidence must be presented as to whether payments made with respect to short-

term commercial paper prior to the maturity date, at significantly above market prices and contrary to the offering documents in the midst of coercion by the holders of the commercial paper resulting from public announcements that make clear that the company is in a severe financial crisis constitute settlement payments commonly used in the securities trade.[13] Thus, evidence must be presented as to whether this particular transaction could be normally regarded as part of the settlement process.

*Enron Corp.,* 325 B.R. at 686 (footnote in original, however, other internal quotations and citation omitted).[14]

### An Interest of the Debtor in Property

If JP Morgan acted as principal, then JP Morgan would have been the party that acquired an interest in Enron's property.[15]

---

13. The Defendants argue that even assuming that the "commonly used in the securities trade" phrase modifies all of the entries in section 741(8), it is the payment itself and not the transaction that must be common in the securities trade and that payment of money must be considered common in the securities trade. The Court, however, concludes that the analysis is not as narrowly focused as Defendants suggest. Rather, it is the payment as associated with the transaction that must be considered as a whole in determining whether the settlement payment is common in the securities trade.

14. The Court recognizes that a transaction that might be considered rare, nevertheless, could be common in the industry. Moreover, not every transaction would have to establish its "commonness," as that would undermine the purpose of the safe harbor. However, as set forth in this Court's June 15, 2005 Opinion, there were sufficient indicia of extremely unique circumstances presented in this case that set it apart and called into question whether, indeed, a "settlement payment" as contemplated by section 546(e) was at issue. *Enron,* 325 B.R. at 686. Nevertheless, where it is clear that a settlement payment is in-

volved, even rare transactions may be considered common in the industry.

15. If a broker/dealer acted as principal and acquired the commercial paper from an investor, it would then have had three options with respect to the commercial paper: (i) it could keep the commercial paper until maturity; (ii) it could sell it on the secondary market to a third-party investor; or (iii) it could seek to redeem the commercial paper with the issuer, prior to maturity. If it redeemed the commercial paper at maturity with an issuer who subsequently filed for bankruptcy, the broker/dealer would have the section 547(c) ordinary course of business defense to an avoidance action. If it resold it to a third-party investor who subsequently files for bankruptcy, then the section 546(e) safe harbor would protect the transaction. Finally, if the broker/dealer, prior to maturity, redeemed the commercial paper with an issuer and that issuer subsequently filed for bankruptcy, the transfer would not come within either the section 546(e) or the section 547(c) exception to avoidance.

Thus, the party redeeming the commercial paper is subject to an avoidance action.

The Investors would not have acquired an interest in Enron's property, or a benefit traceable to Enron, because the Investors would have concluded a separate transaction with JP Morgan, not dependent in any way upon Enron making a payment to JP Morgan. Thus, the Investors would have acquired only JP Morgan's property. Acknowledging that there are factual disputes concerning whether JP Morgan acted as agent or principal, the Investors contend that even if JP Morgan acted as agent, they are entitled to summary judgment because the relevant issue is whether JP Morgan acted as a conduit.[16] The Investors concede that if, in its role as agent, JP Morgan also acted as conduit, the Investors would have been the initial transferees of the transfers of Enron's property. The Investors assert, however, that JP Morgan could not have acted as a conduit to deliver Enron's cash to them in exchange for the commercial paper because the exchange of cash for commercial paper between the Investors and JP Morgan concluded prior to the initiation of the same exchange between JP Morgan and Enron. Therefore, they argue that they received JP Morgan's cash before JP Morgan received Enron's cash and, as a consequence, they could not have received Enron's cash. Having not received Enron's cash, they maintain that they did not receive a transfer of an interest in Enron's property and the transfer is not subject to avoidance.

■ This argument, however, fails to recognize that when a transfer of an interest of the debtor in property is avoided, the trustee, or debtor-in-possession, may recover such avoided transfer either from the initial transferee or from the entity for whose benefit such transfer was made. 11 U.S.C. § 550(a)(1). Thus, if JP Morgan is not considered a conduit, the relevant transfer that a trustee could seek to avoid would be the later transfer between Enron and JP Morgan, where an interest of Enron in property was transferred to JP Morgan. Under that scenario, section 550(a)(1) allows the transfer to be recovered from the entity that benefitted from it, such as the Investors.[17]

*Section 550(a)(1)*

As previously stated, pursuant to section 550(a)(1), a transfer avoided under the Bankruptcy Code can be recovered from the initial transferee or "the entity for whose benefit such transfer was made." The prototype that illustrates the concept of an entity for whose benefit a transfer is made is a guarantor, who receives the benefit but not the actual money paid. *Bonded Fin. Servs. v. European Am. Bank,* 838 F.2d 890, 895 (7th Cir.1988). In the guarantor context, the borrower repays the loan to the lender. Therefore, the lender is the initial transferee of that repayment. The guarantor does not re-

---

However, if the redemption is at maturity, the holder would have the ordinary course of business defense. If it is not redeemed at maturity, the ordinary course of business defense would not likely be available. The safe harbor would not provide protection from avoidance in either case regarding redemption. *See infra* note 23.

**16.** Ordinarily, an agent that makes a payment using property transferred to it by the principal is considered a conduit. If an agent advances its own property to make a payment

and is subsequently reimbursed by the principal, the agent, generally, is not considered a conduit.

**17.** Inasmuch as a transfer could be recovered from the Investors if JP Morgan were an agent, whether or not it acted as a conduit in that capacity, the Court does not reach the issue of whether the debit and credit processing within the DTC system would support a finding that JP Morgan, in its role as agent, functioned as a conduit.

ceive any payment. However, the guarantor is no longer exposed to liability on its guaranty because the underlying obligation has been satisfied.

Pursuant to the structure of section 550, a transferee who actually receives the money or property is considered distinct from an entity that receives a benefit based upon another having received the money or property. *Id.* at 896. Further, the section 550(a)(1) benefit must result from the initial transfer. *Id.* A subsequent transferee is not considered to have received the benefit from the initial transfer. *Id.* Rather, it receives a transfer of the money or property from a previous transferee.

In the guarantor situation, it is the initial transfer that relieves the guarantor of its obligation. In another context, the court in *In re B.S. Livingston & Co.*, 186 B.R. 841, 864–65 (D.N.J.1995) found that the principals of the debtor qualified as section 550(a)(1) beneficiaries. *Id.* at 865. In *B.S. Livingston,* it was alleged that the debtor's core business had been transferred for less than adequate consideration. *Id.* at 865–66. As part of the transaction, the principals obtained lucrative positions with a newly formed division of the transferee company. *Id.* at 847. The court noted that the principals' compensation was tied to the profitability of the assets transferred and concluded that the principals benefitted from consummation of the transaction. *Id.* at 865. Therefore, the principals were deemed section 550(a)(1) beneficiaries. *Id.*

■ The benefit must be "direct, ascertainable and quantifiable" and must correspond to, or be commensurate with, the value of the property that was transferred. *Reily v. Kapila (In re Int'l. Mgmt. Assoc.)*, 399 F.3d 1288, 1293 (11th Cir.2005) (citation omitted). Thus, it is not sufficient if the benefit is incidental, unquantifiable, or

remote. *Id.* In *Intern Mgmt.,* as a condition to giving a loan to a corporation, a lender required that a particular party be the sole owner of the corporation. *Id.* at 1289. To allow that party to become the sole shareholder and obtain the loan, a $100,000 transfer was made by the corporate debtors to buy out another shareholder's interest. *Id.* While the remaining shareholder benefitted by obtaining 100% of the stock of the corporation, thereby enabling him to obtain the desired loan, the court found that this benefit was not the type of tangible or quantifiable benefit required by section 550(a)(1). *Id.* at 1292. The court was influenced by the fact that because the debtor corporations paid $100,000 for stock worth less than that amount, even though the transaction increased the remaining shareholder's ownership concentration, the total control that the shareholder obtained was over assets that had been depleted in value. *Id.* at 1293. As such, the court concluded that there was no direct benefit to the sole shareholder. *Id.* Rather, acquiring the 100% control was an incidental benefit. *Id.*

■ While it is sometimes observed that the entity must be the *intended* beneficiary, *Secs. Inv. Prot. v. Stratton Oakmont, Inc.,* 234 B.R. 293, 314 (Bankr.S.D.N.Y. 1999), others question whether intent is relevant and, if relevant, whether it is the intent of the transferor or the intent of the recipient of the benefit that is at issue. *Bonded Fin. Servs.,* 838 F.2d at 895. *See also* Larry Chek & Vernon O. Teofan, *The Identity and Liability of the Entity for Whose Benefit a Transfer is Made Under Section 550(a): An Alternative to the Rorschach Test,* 4 J. BANKR.L. & PRAC. 145 (1995) (discussing the drawbacks of applying various approaches, including intent-only, benefit-in-fact, or a combination of those approaches). In the cited article,

the authors address the tension in applying the various approaches. The authors maintain that recoveries of avoided transfers are for the purpose of canceling and disgorging the benefit. *Id.* at 156. Therefore, they note that

> where the benefit to the defendant is clear, the debtor's intent ought not to matter; the defendant should be required to disgorge the benefit from an avoided fraudulent or preferential transfer. On the other hand, unless courts are prepared to extend liability under Section 550(a)(1) to the remotest frontiers of benefit-in-fact, there must be some principle to confine liability to an immediate class of beneficiaries. A requirement of intent to benefit effectively restricts the circle of liability to those who directly and foreseeably benefitted from the transfer. Furthermore, an intent element insulates defendants whose receipt of benefit was remote and incidental.

*Id.* at 159. Nevertheless, the authors conclude that the estate can more effectively be made whole

> without burdening remote, incidental beneficiaries by requiring a showing not of intent, but rather a quantifiable, monetary benefit to the defendant. By this means no defendant is placed in the difficult position of disgorging the value of a theoretical or potential benefit, while the trustee avoids litigating the thorny issue of intent when the court has already found the relevant transfer to be fraudulent or preferential as well as a direct benefit to the defendant.

*Id.* at 160. The Court agrees with this latter approach. Thus, showing a direct, ascertainable and quantifiable monetary benefit to the defendant would obviate the need to show intent.

*Applying Section 550(a)(1) to the Transfer Between JP Morgan and Enron*

█ A trustee, or debtor-in-possession, pursuant to section 547(b)(1), may avoid a transfer of an interest of the debtor in property made for the benefit of a creditor and, pursuant to 548(a)(1) may avoid any transfer of an interest of the debtor in property. Thus, if the criteria of sections 547(b)(1) or 548(a)(1) are met, Enron can avoid the transfer of its interest in property made to JP Morgan and, in addition, pursuant to section 550(a)(1), it may recover any such avoided transfer from either JP Morgan or from the entity for whose benefit that transfer was made. If JP Morgan acted as an agent, and even if JP Morgan is not viewed as acting as a conduit, Enron's later transfer of funds to JP Morgan was intended to, and did actually, benefit the Investors. Enron's transfer to JP Morgan benefitted the Investors because until the Enron/JP Morgan transaction concluded, the earlier debits and credits to the custodial accounts of the Investors and JP Morgan would have been reversed, thereby canceling those earlier transfers. Moreover, the Investors could not withdraw the funds from the DTC system until the later transactions concluded. While the Investors could use the funds to make purchases of other securities within the DTC system, they could not withdraw the value from the DTC system. Enron was aware that JP Morgan was acquiring the commercial paper from the Investors, and if JP Morgan was acting as an agent, Enron's payment to JP Morgan for the transfer of the commercial paper was specifically intended to benefit the Investors for their earlier transfers.[18] Thus, if intent to benefit is a

---

18. The Investors argue that by redeeming

the commercial paper, Enron only sought to

required element, Enron has established that intent. More fundamentally, the Investors did actually receive a direct, ascertainable, and quantifiable benefit from the transfer as the Investors were able to finalize the transfers made earlier the same day between themselves and JP Morgan. Nevertheless, because there are factual issues as to whether JP Morgan acted as principal or agent and because, if JP Morgan acted as agent, the later transfers from Enron to JP Morgan benefitted the Investors, summary judgment is not appropriate.

### Aeltus as Advisor

█ In addition to adopting the arguments raised by the ING Funds, Aeltus argues that it did not receive any payment and, therefore, it was not a beneficiary of the transfer. Aeltus maintains that it had neither ownership of the commercial paper transferred to the ING Funds nor the right to use the commercial paper. Aeltus also asserts that it did not receive a commission, payment, credit, or any other direct benefit as a result of the transfer of the commercial paper. Aeltus contends that it was neither a transferee nor a beneficiary of the transfers of the commercial paper from which a section 550(a) recovery can be secured.

Enron argues that Aeltus benefitted because as the entity that made the investment decisions for the ING Funds, Aeltus would have been sued by the ING Funds had they not received their payments from Enron for the underlying debt obligations. Enron maintains that because Enron made those payments, the ING Funds had no cause of action against Aeltus and Aeltus was relieved of the liability to the ING Funds for its investment decisions.

Aeltus counters that the alleged benefit is too uncertain and unquantifiable and, therefore, cannot be the basis upon which to avoid the transfer. Aeltus also argues that because Enron drew down on the bank lines of credit, it would have been able to pay the ING Funds when the commercial paper matured even if the ING Funds had not been paid prior to the maturity date. As a result, Aeltus argues that the ING Funds would not have had causes of action against Aeltus in any event.

In response, Enron asserts that Aeltus, as advisor to the ING Funds, made the investment decisions for the ING Funds. Therefore, even if there is a requirement of an intent to benefit-which Enron does not concede-Enron's desire for future re-entry into the commercial paper market would necessitate that it take actions to please and benefit Aeltus. Thus, Enron contends that it intended to benefit Aeltus in order to facilitate Enron's future re-entry into the commercial paper market. The alleged benefit Aeltus received was that because the ING Funds got paid, they had no cause of action against Aeltus. En-

protect its ability to re-enter the commercial paper market and that was the benefit that Enron intended. The Investors, therefore, contend that the benefit they received was just an incidental third-party benefit from Enron's actions that does not satisfy the element of intended benefit required for avoidance or recovery. The Court does not agree. Here, Enron participated in the DTC system, the very structure of which ensures that the party who initially transfers the commercial paper will ultimately reap any payments re-

sulting from such transfer. Integral to that participation is the understanding that the later payments made within that framework are intended to benefit the party initially transferring the commercial paper. Moreover, in that structure, if the agent were not reimbursed, the credit entry to the earlier transferor would be reversed, which shows a direct material linkage between the payments at issue. This would not be the case with an "incidental" beneficiary.

ron presented evidence of a conversation between a representative of Aeltus and a representative of JP Morgan in which the Aeltus representative acknowledged that Aeltus was prepared to take a lesser recovery for the ING Funds but that Enron acted appropriately in paying accrued par if it were Enron's intent to later re-enter the commercial paper market. Thus, Enron argues that there is evidence that even Aeltus considered the payment a benefit to it. Moreover, with respect to the argument that the benefit is too remote because Enron, in any event, could have paid off the commercial paper at maturity or the ING Funds might not have commenced actions against Aeltus, Enron contends that the measure of benefit is calculated at the time of payment. According to Enron, at that time, Aeltus was relieved of the potential liability in the total amount of the commercial paper paid by Enron.

Whether the benefit to Aeltus was sufficient to qualify as a section 550(a)(1) benefit requires an analysis of the facts and law surrounding the transactions at issue. However, that analysis is not limited to whether Aeltus could be held liable under existing law had the payment not been made. Rather, the analysis should consider, among other things, the degree of certainty that liability would result had the payment not been made. That analysis is more in line with the guarantor situation where the state of the law at issue is fully developed and, simply put, payment equals relief from the certainty of liability that arises from a contractual obligation to assume that liability.

The benefit alleged is that if Enron had defaulted on paying the underlying obligations owed on the commercial paper notes, the ING Funds would have had causes of action against Aeltus for not acting prudently in advising them to invest in Enron. Those actions would entail interpretation of various securities laws. Thus, similar to a guarantor, the claim is that the payment relieved Aeltus from exposure to liability that would have resulted from the nonpayment of the underlying obligation. The benefit flows directly from the initial transfer, as receipt of the payment eliminates any cause of action the ING Funds would have had against Aeltus for Enron's default on the underlying commercial paper obligations. Further, the value attributable to the relief from exposure corresponds to the amount of the transfer. This is because if the transfer had not been made, the relief sought in any action against Aeltus would have been equal to the amount of the payment on the underlying obligation for the commercial paper.

Aeltus argues that prior to its receiving the benefit from the elimination of any cause of action, there would be too many intervening circumstances to consider that make the benefit too remote. These potential intervening circumstances include (i) the ING Funds actually bringing a lawsuit, (ii) Aeltus being deemed to have violated the standard of care applicable thereto, under relevant securities laws and contractual arrangements, as advisor to the ING Funds, or (iii) Enron actually defaulting on the commercial paper. Some of those issues, however, would apply equally to a guarantor who, notwithstanding those issues, is considered to benefit pursuant to section 550(a)(1). Nevertheless, there are certain differentiating aspects of the potential lawsuit at issue here. The area of the law concerning the potential causes of action that could be brought by the ING Funds against Aeltus is unsettled and the related determination involving whether the relevant standard of care applicable to an advisor has been violated is a complex factual inquiry that is not applicable in the guarantor context. Given the foregoing, there is a significant

measure of uncertainty to the potential outcome. Such uncertainty makes the outcome a more theoretical or potential benefit, unlike that of an analogous lawsuit brought against a guarantor. Aeltus cannot be required to disgorge a theoretical or potential benefit. As such, the Court concludes that the alleged benefit received by Aeltus is too remote and unascertainable, under the current state of the substantive law at issue, to establish a benefit under section 550(a)(1). Thus, the motion for summary judgment in favor of Aeltus is granted.

## Repayment of Loan

 Commercial paper is a loan, with a corporation borrowing the money in the marketplace instead of from a bank. Enron maintains that all of the parties knew that Enron was paying off the commercial paper loans.[19] Ordinarily, short-term commercial paper is held until maturity. The purchaser seeks an investment for excess cash for a short period and calculates when it will require the return of its principal. The issuer of commercial paper needs funds for a particular length of time and it sets the maturity date for a time when it expects to have funds to pay off the commercial paper. Occasionally, however, the issuer may want to adjust its balance sheet to have less debt outstanding and may offer to pay off the commercial paper. Alternatively, a holder of commercial paper may have a liquidity issue and may seek to sell its commercial paper holdings prior to maturity to obtain the cash. Usually, when this situation occurs, the broker/dealer involved attempts to make a market for the commercial paper, and it will acquire the commercial paper for its own account and either hold it until maturity or sell it in the secondary market to another holder. In the secondary market, the commercial paper is sold at the prevailing market price, with the broker/dealer anticipating making a profit equal to the amount of the spread between the price at which it acquires the commercial paper and the price at which it sells it in the secondary market.

The transactions at issue, however, were not conducted in the usual manner.[20] Instead of acting as principal and making a market for the commercial paper, evidence was presented indicating that the broker/dealers, including JP Morgan, all sought to distance themselves from the transactions, often citing the risk of preference liability as their rationale. The broker/dealers allege that, initially, they

19. During this period, Enron had been under close scrutiny by financial analysts and the press. An October 26, 2001 Wall Street Journal article addressed Enron's decision to redeem its commercial paper prior to maturity. In addition, JP Morgan recorded certain telephone conversations, including one where a JP Morgan sales representative advised Aeltus, who made the ING Funds' investments, that JP Morgan was acting as agent for Enron to retire the commercial paper. Also, Bloomberg tickets related to the transfers list JP Morgan as agent to retire the commercial paper.

Although the Alfa representative claims not to have seen the Wall Street Journal article, the representative indicates that he was informed of certain rumors circulating about Enron but claims not to have inquired as to their substance. There is contradictory evidence concerning the timing of Alfa's entry into the agreement to transfer its commercial paper, and an e-mail from JP Morgan to Enron suggests that, prior to that agreement, Alfa had knowledge that Enron was involved in the transaction. The e-mail was sent before JP Morgan agreed to act as agent, during the period when JP Morgan was merely connecting commercial paper holders and Enron. In the e-mail, JP Morgan notified Enron that Alfa was a commercial paper holder interested in participating in the transactions.

20. In the earlier transactions, pursuant to which the ING Funds and Alfa purchased Enron's commercial paper, JP Morgan acted in its customary role as principal.

only consented to assist in bringing Enron and the commercial paper holders together to allow them to make their own arrangements. The broker/dealers maintain that they later agreed to accept an intermediary role but sought to limit their respective role to that of an agent.[21] Moreover, unlike previous commercial paper transactions in which broker/dealers have participated, evidence was presented here that, at least in certain of these Enron transactions, the relevant broker/dealer, quite strikingly, did not receive any type of markup, margin, spread, fee or commission. Further, in an orderly exit from the commercial paper market, the issuer usually draws down on its bank lines of credit to pay the commercial paper as it matures, not to prepay the commercial paper. On October 26, 2001, an article appeared in the Wall Street Journal indicating that Enron was preparing to draw down on its $3 billion revolver lines of credit to redeem its outstanding commercial paper prior to maturity. Indeed, certain of the commercial paper holders redeemed their notes just one to two days prior to maturity.[22]

Commercial paper is a note evidencing a debt, which entails the attendant credit risk. Enron argues that when the Investors acquired Enron's commercial paper, they also acquired Enron's credit risk, as that risk was inherent in the very nature of the instrument. Enron further argues that the section 546(e) safe harbor was not intended to protect creditors from a credit risk that they assumed. Enron maintains that the Investors freely assumed (1) the credit risk when they acquired the commercial paper, and (2) the preference risk

when they accepted payoff of the debt prior to maturity. Enron further argues that the note evidencing the debt was retired before maturity. When Enron redeemed the commercial paper, it was transferred to the Chase IPA account and immediately extinguished. As soon as Enron's commercial paper was prepaid, the Chase IPA withdrew it from the DTC system. Thus, Enron maintains that it did not acquire title or ownership of the commercial paper and there was no purchase or sale of the commercial paper as required for protection under the section 546(e) safe harbor. Rather, Enron argues that it merely paid off a debt and the Investors received payment on the underlying debt obligation.

■ The Second Circuit has recognized that "a maker's paying a note prior to maturity in accordance with its terms would not be regarded as a 'purchase.'" *SEC v. Sterling Precision Corp.*, 393 F.2d 214, 217 (2d Cir.1968). Further, the transfer of ownership of an asset is required for a purchase and sale. *Id.* (noting that "purchase" means "the acquisition of title to, or property in, anything for a price"). In *Sterling Precision*, the court concluded that when an entity discharges a bond or debenture, it does not acquire title to it. *Id.* Rather, "[p]ayment and discharge of a bond is neither sale nor exchange within the commonly accepted meaning of the words." *Id.* (quoting, *Fairbanks v. United States*, 306 U.S. 436, 437, 59 S.Ct. 607, 608, 83 L.Ed. 855 (1939)).

■ The safe harbor is not intended to protect an investor from the credit risk

---

21. At the Hearing, Alfa's counsel conceded that, as a legal matter, if JP Morgan, indeed, acted as an agent, it did not matter whether Alfa was aware of its role for purposes of determining whether the transfer was subject to a preference.

22. As previously noted, had those commercial paper holders waited until maturity, the transfers would have been protected from avoidance. The protection, however, would have been provided by the section 547(c)(2) ordinary course of business defense, and not by the safe harbor.

inherent in the instrument. Rather, it is to protect the investor from risks incidental to the flow of payments within the system set up to channel payments and transfer the instrument. As such, the transfer of "ownership" of a security is an integral element in the securities settlement process. Here, Enron redeemed its commercial paper and paid off the underlying debt. The commercial paper was transferred to the Chase IPA account and immediately extinguished. Enron did not acquire title or ownership of the commercial paper. Rather, the commercial paper was immediately withdrawn from the DTC system. Furthermore, the payments made to the Investors were not based upon the prevailing market rate of the commercial paper. Rather, the Investors received the payment of their principal and interest up until the date of payment, based upon the economic terms of the commercial paper. Thus, the payments were in substantial compliance with the economic terms of the commercial paper, in that the interest rate paid was simply a pro ration on a per-day basis.

The SEC contends that the *Sterling Precision* court's interpretation of whether a redemption is a "sale" is limited to application under the Investment Company Act. Further, the SEC notes that the Second Circuit recognized that the term "sale" may have a broader definition in certain contexts. In addition, the SEC directs the Court's attention to *Drachman v. Harvey,* 453 F.2d 722, 737 (2d Cir.1971) (*en banc*) where the court ruled that a redemption of convertible debentures by a corporation under section 10(b) of the Securities Exchange Act was a purchase, thereby adopting a broader meaning of the term in that context. The SEC argues that the *Drachman* decision indicates that the Second Circuit has withdrawn somewhat from the *Sterling Precision* analysis.

In *Drachman,* however, the redemption of the convertible debentures allowed the issuer of the debt to acquire its stock. Given the nature of the security at issue there, it was a simultaneous transaction, as convertible debentures are by definition convertible into stock. Therefore, the court may have "collapsed" the transaction and considered it a "purchase" because it viewed the redemption of the convertible debentures as the equivalent of buying the stock. Collapsing the transaction reflected its essence—a purchase of the issuer's stock. Here, the essence of the transaction is that Enron paid the underlying obligation on the note. Enron's ability to pay the obligation for the commercial paper note was precisely the risk assumed by the holder of that instrument.

The SEC also argues that Enron's prepayment on the notes is distinguishable from payment at maturity. The SEC notes that Enron made an offer to purchase its notes because it had no legal right to compel the holders to surrender them, and that it was only because the holders agreed to the offer that Enron was able to retire them. The SEC contends that the case is distinguishable from a redemption at maturity or a contractual right to redeem prior to maturity. The SEC, therefore, argues that it is not inconsistent to view the transactions as both a repurchase of a debt and a repayment.

In effect, the SEC's view is that each of the overall relevant transactions at issue is a two-step process similar to that applied to the purchase of stock in a leveraged buyout, where the stock is purchased and then immediately cancelled. In such transactions, the purchase of the stock has been held to be protected by the section 546(e) safe harbor. *Kaiser I,* 913 F.2d at 850 (concluding that money and preferred shares received for stock was a settlement payment from perspective of financial in-

stitution); *Kaiser II*, 952 F.2d at 1240 (reaching same conclusion from perspective of stockholder).

 There is, however, a fundamental difference between a stock transaction and a commercial paper transaction. Stock cannot be extinguished by its own terms. Rather, the corporation has to reacquire its stock in order to cancel it. Thus, because the stock is "purchased" by the issuer, it is a securities transaction. On the other hand, commercial paper is extinguished automatically upon payment of the underlying debt obligation. The commercial paper is swept into the issuing and paying agent's account and immediately after payment, it is removed from the DTC system. This occurs whether the commercial paper debt obligation is paid at maturity or prior to maturity. As long as the issuer pays the monetary equivalent of the amount that would be received at maturity, pro rated to the date of payment, there is no reason to treat the retirement of the debt obligation differently whether the commercial paper is redeemed at maturity or prior to maturity. Early retirement of the commercial paper still entails

payment on the underlying debt obligation and, as such, the holder assumes the credit risk of the issuer's ability to pay off the obligation. Further, the entity receiving payment assumes the related preference risk associated with the payment of a loan.

The argument seeking to treat each of the overall relevant transactions at issue as a two-step process is further undermined because the prices paid for the commercial paper were substantially above market price. To be considered a sale followed by a redemption, one would assume that the amount paid for the "sale" of the commercial paper would reflect the prevailing market price. Instead, the amounts paid here were equal to the principal plus accrued interest to the date of payment, thereby reflecting payments on the underlying loans.[23]

Finally, the Investors and the SEC argue that a ruling that section 546(e) does not protect a prepayment of commercial paper from avoidance will result in uncertainty in, and chill, the secondary market for commercial paper. This argument, however, assumes that the participants

---

**23.** The Investors also argue that the legislative history of the 1982 and 1984 amendments to sections 546(e) and 741(8) support a finding that section 546(e) applies to commercial paper. Enron argues that the legislative history of those amendments, as well as the legislative history of the 1984 amendments to section 547(c)(2) clearly indicate that the section 546(e) safe harbor was not intended to protect commercial paper payments from avoidance.

There is some merit to both arguments. The Investors are correct to the extent that section 546(e) applies to the purchase and sale of commercial paper. However, the legislative history of sections 547(c)(2) supports the finding, as Enron argues, that the 546(e) safe harbor does not apply to a redemption of commercial paper. While Enron argues that section 546(e) does not apply at all to commercial paper, the Court limits the finding to the issue of redemption.

The legislative history and the case law imply that redemption of commercial paper at maturity is not covered by the safe harbor. *See e.g., Union Bank v. Wolas,* 502 U.S. 151, 157 n. 10, 112 S.Ct. 527, 531 n. 10, 116 L.Ed.2d 514 n. 10 (1991). Rather, the 547(c) ordinary course defense protects maturity payments from avoidance. Originally, the ordinary course defense provided protection only for debts incurred within 45 days. The amendment eliminating that time restriction for its application, was implemented, in part, to address concerns by commercial paper issuers who often would limit the duration of commercial paper to 45 days because of the restriction. *Id.* Had the already existing safe harbor under section 546(e) applied, the commercial paper issuers would not have had those concerns.

originally held the belief that the section 546(e) safe harbor applied to the transactions at issue. The factual development of this case belies such notion. Notwithstanding extensive discovery concerning all of the interactions among the multiple parties involved in the various transactions originally subject to the adversary proceedings, no evidence has been presented that any party referenced the potential protection of the safe harbor. There were many references to the fear of avoidance in a bankruptcy and the benefit of having the payment up front to force the bankruptcy estate to recover any payment, but not even one reference to the possibility that the safe harbor would apply. Moreover, the insistence by each of the broker/dealers to act as agent, instead of in the usual role of principal, further supports the proposition that throughout the industry no one readily considered the safe harbor as protecting the types of transactions at issue here-redemption of commercial paper. Indeed, the record reflects that it was the insistence by the broker/dealers to depart from their usual role as principal in a commercial paper transaction that altered "business as usual" in the secondary market.

Further, the fear that sellers of commercial paper in the secondary market will be reluctant to sell commercial paper because they will not know if the broker/dealer is acting as principal or agent for an issuer redeeming commercial paper can be readily remedied by the DTC. The DTC system could put in place a mechanism that places the burden upon the broker/dealer to indicate clearly to the transferor of commercial paper whether the broker/dealer was acting as principal or as agent for an issuer redeeming its commercial paper. The broker/dealers were primary players in taking the transactions at issue outside of the realm of what was common in the trade, by their efforts to

depart from their usual role of principal. Thus, it would not be inequitable, unjust, or unfair to hold the broker/dealers accountable if commercial paper holders in the secondary market are not apprised that the transaction actually involves a redemption by the issuer. Such a procedure would provide clarity and avoid any uncertainty in the secondary market.

### Earmarking

▋ Pursuant to section 547(b), a transfer can only be avoided if it is of "an interest of the debtor in property." *Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171, 184 (2d Cir.2007). Courts have fashioned the "earmarking doctrine" to describe certain transfers in which a debtor does not have an interest, with the result that the transfer is not avoidable under section 547(b). *Id.* Where a third party lends a debtor money for the specific purpose of paying a particular creditor, the loan funds are considered "earmarked" for that creditor and the transfer of those funds from the debtor to that particular creditor cannot be avoided. *Id.*

Initially, the earmarking doctrine was applied in cases where a guarantor secured a debtor's obligations because it was the guarantor's property that was transferred, resulting in no diminution to the debtor's estate. *McCuskey v. Nat'l Bank of Waterloo (In re Bohlen Enters., Ltd.)*, 859 F.2d 561, 565 (8th Cir.1988) (citing, *Nat'l Bank of Newport v. Nat'l Herkimer County Bank*, 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912)). In that context, when a debtor fails to pay a debt it owes, the party that has guaranteed that the payment will be made is called upon to pay the amount due to the old creditor. The guarantor then directly pays the old creditor. As such the funds transferred are the guarantor's property and not the debtor's property. *Id.* Consequently, there is no

diminution in the estate and the amount available for distribution to general creditors remains unchanged. *Id.* Additionally, courts may have been motivated by a desire to avoid unfairness and inequity to the guarantor who would be called upon to pay the same debt twice.[24] *Id.*

Subsequently, the earmarking doctrine was expanded to cover instances where a third party provides the debtor with funds "for the express purpose of enabling the debtor to pay a specific creditor." *Cadle,* 503 F.3d at 184 (citing cases) (emphasis added). Any such transfer was viewed as a substitution of a new creditor for the former one. *Id.*[25]

In *Cadle,* the Second Circuit noted that various approaches had developed to determine whether it is appropriate to apply the earmarking doctrine to a particular case. *Cadle,* 503 F.3d at 184–85. The first approach described by the *Cadle* court was that adopted by the Eighth Circuit in *McCuskey,* 859 F.2d at 565. The *McCuskey* court held that three requirements must be met to qualify for application of the earmarking doctrine. *Cadle,* 503 F.3d at 184 (citing *McCuskey,* 859 F.2d at 566). These requirements are

(1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt,

(2) performance of that agreement according to its terms, and

(3) the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate.

*Id.* at 184–85. The Second Circuit then categorized the other formulations developed by various courts as "focus[ing] primarily on whether the debtor lacked control over the funds supplied by the new creditor." *Id.* at 185 (citing *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1358 (5th Cir.1986) (other citation omitted)).

The Second Circuit proceeded to set forth its own history of having applied the general principles behind the earmarking doctrine without necessarily having applied the term "earmarking." *Cadle,* 503 F.3d at 185. Thus, the Second Circuit noted that it previously had concluded that

where a debtor receives funds subject to a clear obligation to use that money to pay off a preexisting debt, and the funds are in fact used for that purpose, those funds do not become part of the estate and the transfer cannot be avoided in bankruptcy.

*Id.* (citing *Grubb v. Gen. Contract Purchase Corp.,* 94 F.2d 70, 73 (2d Cir.1938)). The Second Circuit, however, was careful to note the limitations on this principle by

---

**24.** This double payment would result because the guarantor had an obligation to make the old creditor whole by insuring he received payment on the debt owed to him. After the guarantor paid the old creditor, if the payment to the old creditor were deemed a preference, the old creditor would be required to return the payment it had received to the bankruptcy estate. Thereafter, the old creditor, who was the beneficiary of a guaranty, would turn to the guarantor again to make him whole and the guarantor would be obliged to make another payment.

**25.** The *McCuskey* court questioned the wisdom of extending the earmarking doctrine outside of the context of guarantors because the court noted that it would not help a debtor and actually would harm a new creditor, to the extent that the new creditor is a general creditor. *McCuskey,* 859 F.2d at 566. As such, the new creditor would receive its recovery from an estate that was diminished in value to the extent that it failed to recover the payment made to the old creditor. *Id.* Moreover, the *McCuskey* court saw no equitable basis for preferring the old creditor. *Id.*

referencing its clear expression of when a transfer of new funds remains part of a debtor's bankruptcy estate, subject to avoidance under section 547(b).

> [W]here a new creditor provides funds to the debtor with no specific requirement as to their use, the funds do become part of the estate and any transfer of the funds out of the estate is potentially subject to trustee's avoidance powers.

*Id.* at 185 (citing *Smyth v. Kaufman (In re J.B. Koplik & Co.)*, 114 F.2d 40, 42 (2d Cir.1940)). Moreover, the Second Circuit emphasized that this result was not altered "even where the new creditor knows, but does not require, that the new loan funds will be used to pay off a preexisting debt." *Id.*

 The defendants argue that the requisite obligation to pay off the pre-existing debt does not have to emanate from the new lender. Rather, they argue that the obligation can flow from another source, and that it is sufficient that a debtor recognizes some obligation compelling it to use the new funds to pay off the pre-existing debt. The Investors note that Enron was legally required to use the bank-facility funds to replace the commercial paper debt. The Investors point to a directive from Enron's board requiring Enron not to issue commercial paper in an amount greater than the balance available on the commercial paper backup credit lines. According to the Investors, once

Enron drew down the lines of credit, Enron could no longer have commercial paper outstanding. Thus, the Investors maintain that Enron was compelled to use the bank-facility funds to eliminate its outstanding commercial paper.[26]

However, anyone who has a pre-existing debt has some manner of obligation and compulsion to pay it off-even if it is simply the obligation under the underlying contract with the lender, and the compulsion of a potential action for breach of contract. In *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns., Inc.)*, 554 F.3d 382 (3d Cir.2009), the Third Circuit was faced with an argument similar to that presented by the Investors. In *Winstar*, the debtor was party to a credit agreement with a creditor that required the debtor to pay that creditor any increase in funds received from a separate bank facility. *Id.* at 392. That bank facility consisted of a revolving line of credit made available to the debtor by a consortium of bank lenders. *Id.* Thereafter, a new lender joined the consortium and agreed to lend the debtor an additional amount of money. *Id.* at 393. The relevant documents provided that the amounts under the additional loan were to be used for "general corporate purposes." *Id.* In the debtor's subsequent bankruptcy, in response to the trustee's preference action to recover the payment made to the old creditor, that creditor argued that the transfer was protected by the earmarking doctrine. *Id.* at 400. It was argued that the new lender was aware

---

**26.** The Investors also contend that shortly before drawing down funds from the bank facilities, Enron made oral representations to the banks that it intended to use the proceeds to pay for the commercial paper. The Investors argue that Enron therefore was compelled to make those payments, otherwise it would have been subject to criminal law penalties for misrepresentations made to the banks for the purpose of obtaining a loan. The Court does not agree. Even if Enron made these statements, the statements were not material under the facts of this case. These bank lines were already committed. Therefore, the banks could not have relied upon the statements to make the loans as the banks were already obligated to make them. Further, the bank-facility agreements, which provided that the proceeds could be used for general corporate purposes, also provided that those agreements could be amended only by a writing.

that the agreement between the previous creditor and the debtor required the debtor to pay the proceeds of the new loan to the creditor, and that the debtor intended to make such payment. *Id.* at 401. Moreover, a failure to make such payment would have been an event of default under the credit agreement with the old creditor, which, in turn, would have cross-defaulted to the separate bank facility. *Id.* The *Winstar* court dismissed these arguments. *Id.* at 401–02. Citing *Cadle,* the *Winstar* court concluded that there had to be evidence of an agreement between the new creditor and the debtor that the funds would be used to pay a specified antecedent debt, and that it was not sufficient to show that the new creditor knew of the intended use of the funds, if the new creditor did not require that the funds would be so used. *Id.* (citing *Cadle,* 503 F.3d at 185).

Reviewing the facts before it, the *Winstar* court noted that, "at most," the new lender was aware that the credit agreement between the debtor and the old creditor required the debtor to pay the proceeds of the new lender's loan to the old creditor and that the debtor intended to make such payment. *Id.* at 402. The *Winstar* court concluded that while the debtor's failure to so pay the funds

> would have ultimately led to an event of default under the Bank Facility, that merely implies that the Bank Facility lenders (including [the new lender]) could have brought breach of contract claims against [the debtor]-not that [the new lender] conditioned its loan on [the debtor's] payment to [the old lender].

*Id.* at 402. Thus, the Third Circuit concluded that earmarking was inapplicable, absent a requirement in the new lender's agreement conditioning the loan on payment to the creditor seeking the benefit of the earmarking doctrine.

Here, the relevant loan documents permitted Enron to apply the loan funds for general corporate purposes, with no other limitations or conditions imposed by the lender. While Enron may have faced compulsion from other sources to comply with certain obligations, such compliance was not a condition of the loan. Moreover, any failure to comply with those other obligations would have only subjected Enron to whatever consequences would flow from such failure. Enron, however, received the loan funds from the bank facility with no "specific requirement" to pay off the commercial paper. Unlike credit-backed commercial paper, where a letter of credit, or other funding, is set up to provide a back-up for payments for commercial paper, there was no enforceable obligation in the back-up bank facility to strictly apply any loan proceeds to the payment of the commercial paper. Instead, as noted previously, the funds could be used for any corporate purpose. As such, upon their receipt, the funds became part of Enron's estate. Accordingly, any transfer of those estate funds subjects such transfer to the avoidance powers.

Moreover, even following the analysis of those courts that focus on the "control" element leads to the same result. Certain of these courts analyze the doctrine as not requiring proof of third-party lender intent because the restriction placed on the use of the proceeds can emanate from any source. *See e.g., Coral,* 797 F.2d at 1361 (noting that, although establishing the intent of the third-party lender is one way to prove lack of control, it is not the only way). Nevertheless, the debtor's lack of "dispositive control" must still be proven. *Id.*

Here, as long as the funds were used for general corporate purposes, once Enron received the funds, the banks did not dictate how those funds should be applied.

The funds became part of the Enron's general funds to be used for any legitimate corporate purpose. As part of Enron's general funds, transfer of those funds subjected them to avoidance as a preference.

The Investors further argue that paying off the commercial paper with the funds from the bank facility did not diminish Enron's estate. This is because Enron substituted the unsecured commercial paper creditors for the unsecured back-up facility lenders, who were owed an equal amount. The Investors maintain that avoiding the transfer would result in Enron receiving a windfall which was not the intent of the avoidance section.

 The absence of a diminution to the estate is not, by itself, sufficient to call for application of the earmarking doctrine. In fact, it may be argued that any time the proceeds of a new loan are used to pay off an antecedent debt, there is no diminution in the estate. However, the net value of the estate is considered only after the other elements for the application of the earmarking doctrine are met. It is only after a determination is made either (i) that the debtor complied with the new lender's specific directive that the funds be applied to the debt of the previous creditor or (ii) that the debtor lacked control over the funds supplied by the new creditor, that a court considers whether the estate has been diminished. Further, in preventing application of the earmarking doctrine when the criteria for application are not met, there is no windfall to the debtor because, as is always the case with a preference, the funds are taken from a party entitled to payment strictly for the purpose of achieving a fairer distribution to all creditors.

Therefore, because there were no restrictions on Enron's use of the credit lines, other than for general corporate purposes, Enron could use the funds for any corporate purpose. Thus, under either of the two main approaches for application of the earmarking principle, it would not apply under these circumstances because there was neither an agreement between Enron and the lenders under the lines of credit to limit use of the proceeds of the loans to payment of the commercial paper nor did Enron lack control over those funds.

## CONCLUSION

The Court concludes that there are factual issues concerning whether the section 546(e) safe harbor would protect the payments at issue from avoidance. If the payments were made to retire a debt, such payments were not then for the purchase, sale, or loan of securities. Rather, the payments would have been to satisfy the underlying debt obligation. As such, they would not be settlement payments and not be protected from avoidance by the section 546(e) safe harbor. Thus, a trial is necessary to determine whether JP Morgan acted as principal or agent. If JP Morgan acted as agent for Enron, then any transfers to retire debt that benefitted the Investors are not protected from avoidance by the safe harbor.

The Court concludes that the benefit received by Aeltus is too remote and unascertainable, under the facts of this case, to qualify it as a party that benefitted under section 550(a)(1).

Further, the Court concludes that, under the circumstances of the case, the earmarking principle would not apply to protect the payments from avoidance.

Therefore, the motions for summary judgment filed by the ING Funds and Alfa are denied. However, the motion for summary judgment filed by Aeltus is granted.

Counsel for Enron is to settle an order consistent with this Opinion and include in

that order a date for a pre-trial conference to schedule a trial date.