09-5122-bk(L)
In re: Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2010
(Argued: November 3, 2010        Decided: June 28, 2011)
Docket No. 09-5122-bk(L)09-5142-bk (Con)
--------------------------------------------------------x

In Re: ENRON CREDITORS RECOVERY CORP.,

    Appellant,

                -- v. --

ALFA, S.A.B. DE C.V., ING VP BALANCED PORTFOLIO, INC.,
ING VP BOND PORTFOLIO, INC.,

    Appellees.

--------------------------------------------------------x

B e f o r e :  WALKER, CABRANES, Circuit Judges, and KOELTL,
               District Judge.*

    Appeal from a judgment of the United States District Court

for the Southern District of New York (Colleen McMahon, Judge)

reversing an order of the United States Bankruptcy Court for the

Southern District of New York (Arthur J. Gonzalez, Bankruptcy

Judge) and remanding with instructions to enter summary judgment

in favor of Appellees Alfa, S.A.B. de C.V., ING VP Balanced

Portfolio, Inc., and ING VP Bond Portfolio, Inc.  Appellant Enron

Creditors Recovery Corp. challenges the district court's

---

* The Honorable John G. Koeltl, of the United States District
Court for the Southern District of New York, sitting by
designation.

1

conclusion that 11 U.S.C. § 546(e) protects from avoidance pre-petition payments Enron Corp. made to redeem, prior to maturity, commercial paper it had issued.  It argues that Enron Corp.'s payments did not constitute "settlement payments" within the meaning of § 546(e)'s safe harbor both because they were repayments of debt and because they were not common in the securities industry.  We hold that Enron Corp.'s payments were "settlement payments" and thus were protected from avoidance under § 546(e).  We therefore AFFIRM the judgment of the district court.

Judge KOELTL dissents in a separate opinion.

MICHAEL SCHATZOW (Robert L. Wilkins, Mitchell Y. Mirviss, Colleen M. Mallon, Richard L. Wasserman, on the brief), Venable LLP, Baltimore, MD, for Appellant Enron Creditors Recover Corp.

MICHAEL L. COOK (Brian C. Tong, on the brief), Schulte Roth & Zabel LLP, New York, NY, for Appellee Alfa, S.A.B. de C.V.

SABIN WILLETT (Mark M. Elliott, Eric Heining, on the brief), Bingham McCutchen LLP, Boston, MA, for Appellees ING VP Balanced Portfolio, Inc., and ING VP Bond Portfolio, Inc.

Mark D. Cahn, Deputy General Counsel (Morgan Bradylyons, Attorney, Jacob H. Stillman, Solicitor, Katharine B. Gresham, Assistant General Counsel), on the brief, Securities and Exchange Commission, Washington DC, for amicus curiae Securities and Exchange Commission.

Joshua D. Cohn (Christopher J. Houpt), on the brief, Mayer Brown LLP, New York, NY, for amicus curiae Securities Industry and Financial Markets Association.

JOHN M. WALKER, JR., Circuit Judge:

This appeal raises an issue of first impression in the courts of appeals: whether 11 U.S.C. § 546(e), which shields "settlement payments" from avoidance actions in bankruptcy, extends to an issuer's payments to redeem its commercial paper

prior to maturity. Enron Creditors Recovery Corp. ("Enron")[1] seeks to avoid and recover payments Enron made to redeem its commercial paper prior to maturity from Appellees Alfa, S.A.B. de C.V. ("Alfa"), ING VP Balanced Portfolio, Inc., and ING VP Bond Portfolio, Inc. (collectively, "ING"), whose notes were redeemed by Enron. Alfa and ING argue that § 546(e) protects these payments from avoidance.

The Bankruptcy Court for the Southern District of New York (Arthur J. Gonzalez, Bankruptcy Judge) concluded that § 546(e)'s safe harbor does not protect Enron's payments from avoidance because they were made to retire debt, not to purchase securities, and because they were extraordinary. The District Court for the Southern District of New York (Colleen McMahon, Judge) held that Enron's payments do fall within the safe harbor, reversed the Bankruptcy Court's decision, and remanded with instructions to enter summary judgment in favor of Alfa and ING.

On appeal, Enron challenges the district court's conclusion that the safe harbor protects Enron's redemption payments whether or not they were made to retire debt or were unusual. Because we agree with the district court that Enron's proposed exclusions from the reach of § 546(e) have no basis in the Bankruptcy Code, we AFFIRM its decision and order.

---

[1] This opinion will refer to Enron Corp. and the reorganized entity, Enron Creditors Recovery Corp., collectively as "Enron."

4

After a series of events in the latter half of 2001, including the resignation of its CEO, Jeffery Skilling, its announcement of $600 million in third-quarter losses, the commencement of an SEC investigation into its practices, and the correction of four years' worth of financial statements, Enron, a Houston-based energy company, collapsed. See, e.g., David S. Hilzenrath, Early Warnings of Trouble at Enron, Wash. Post, Dec. 30, 2001, at A10.

On December 2, 2001, Enron petitioned for Chapter 11 bankruptcy. This appeal arises out of Enron's attempt to avoid and recover pre-petition payments it made to redeem, prior to maturity, commercial paper it had issued.

**I. Facts**

Between October 25, 2001 and November 6, 2001, Enron drew down on its $3 billion revolving lines of credit and paid out more than $1.1 billion to retire certain of its unsecured and uncertificated commercial paper prior to the paper's maturity. Enron redeemed the commercial paper at the accrued par value, calculated as the price originally paid plus accrued interest. This price was considerably higher than the paper's market value.

The offering memoranda that accompanied the issuance of the commercial paper provided that the "Notes are not redeemable or

5

subject to voluntary prepayment by the Company prior to maturity." This provision prohibited calls and puts: Enron could not force investors to surrender the notes and the investors could not require Enron to prepay them.

The Depository Trust Company (the "DTC"), a clearing agency, maintained bookkeeping entries that tracked ownership of Enron's commercial paper. This is the customary tracking method in the industry. Every issuer of commercial paper has an issuing and paying agent ("IPA") within the DTC to issue commercial paper and to pay at maturity or at an early redemption.

Three broker-dealers, J.P. Morgan, Goldman, Sachs & Co., and Lehman Brothers Commercial Paper, Inc., participated in Enron's redemption. They received the commercial paper from the individual noteholders and paid them the redemption price. The mechanics of these transfers were as follows. The DTC debited the redemption price from each broker-dealer's account and credited it to the noteholder's DTC account. The broker-dealers then transferred the notes to the DTC account of Enron's issuing and paying agent, Chase IPA, and received payment from Enron through the DTC. Immediately after the broker-dealer received payment, the commercial paper Enron redeemed was extinguished in the DTC system. Confirmations of these transactions referred to them as securities trades, termed them "purchases" from the holders, and referenced a "trade date" and "settlement date."

Prior to these transactions, ING and Alfa owned Enron commercial paper in the amount, respectively, of $48,200,000 and $5,667,255. They both agreed to transfer their commercial paper to broker-dealer J.P. Morgan in exchange for the redemption price.

The parties dispute the circumstances and motives surrounding Enron's redemption. Enron argues that it made the redemption payments under pressure from noteholders seeking to recover on their investments amidst rumors of Enron's imminent implosion. Alfa and ING argue that Enron redeemed its commercial paper to "calm the irrational markets" and leave a favorable impression that would allow it to reenter the commercial paper market once "bad publicity" about the company's stability "had blown over." They argue that the redemption was an economically rational move that allowed Enron to refinance its existing commercial paper debt with debt at a lower interest rate.

**II. Procedural History**

In November 2003, two years after Enron filed for bankruptcy, the reorganized entity brought adversary proceedings against approximately two hundred financial institutions, including appellees Alfa and ING, seeking to avoid and recover the redemption payments. It alleged that the payments were recoverable as (1) preferential transfers under 11 U.S.C. § 547(b), because they were made on account of an antecedent debt

7

within ninety days prior to bankruptcy, and (2) constructively fraudulent transfers under 11 U.S.C. § 548(a)(1)(B), because the redemption price exceeded the commercial paper's fair market value.

In 2004, the defendants in the adversary proceedings moved to dismiss Enron's complaint for failure to state a claim. They argued that the redemption payments were "settlement payments" protected from avoidance under 11 U.S.C. § 546(e)'s safe harbor.

Section 546(e) provides, in relevant part, that

> [n]otwithstanding sections . . . 547 [and] 548(a)(1)(B) . . . of this title, [which empower the trustee to avoid preferential and constructively fraudulent transfers,] the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section . . . 741 of this title, made by or to (or for the benefit of) a . . . stockbroker, financial institution, financial participant, or securities clearing agency . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title[, which empowers the trustee to avoid transfers made with actual intent to hinder, delay, or defraud creditors].

Section 741(8) of Title 11, in turn, defines a "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."

The bankruptcy court denied the motion to dismiss. It held that the phrase "commonly used in the securities trade" in § 741(8) modifies all the terms in the section's definition and thereby limits protected "settlement payments" to those that are

8

common in the industry. <u>In re Enron Corp.</u>, 325 B.R. 671, 685-86 & n.7 (Bankr. S.D.N.Y. 2005)("<u>Enron I</u>"). The bankruptcy court held that evidence was necessary to determine whether the redemption payments were commonly used, rather than, as Enron alleged, extraordinary because they resulted from coercion by holders of the commercial paper. <u>Id.</u> at 686. It also held that a factual issue existed over whether Enron's redemption payments were made to retire debt or to purchase the commercial paper, and that this distinction could affect whether the payments constituted settlement payments. <u>Id.</u> Most of the defendants settled with Enron after Judge Gonzalez denied their motions to dismiss.

Following discovery, Alfa and ING, relying on § 546(e)'s safe harbor, moved for summary judgment. The bankruptcy court denied the motions. <u>In re Enron Creditors Recovery Corp.</u>, 407 B.R. 17, 45 (Bankr. S.D.N.Y. 2009)("<u>Enron II</u>"). Concluding that "the transfer of 'ownership' of a security is an integral element in the securities settlement process," it held that "settlement payments" include only payments made to buy or sell securities and not payments made to retire debt. <u>Id.</u> 37-41. The bankruptcy court relied on our decision in <u>SEC v. Sterling Precision Corp.</u>, 393 F.2d 214 (2d Cir. 1968), in which we held that "a maker's paying a note prior to maturity in accordance with its terms would not be regarded as a 'purchase'" under the Investment

9

Company Act of 1940. Enron II, 407 B.R. at 38 (quoting Sterling Precision, 393 F.2d at 217). The bankruptcy court concluded that Alfa and ING had not demonstrated that Enron's payments were settlement payments as defined in § 741(8), because they had failed to establish that the payments were made to acquire title to the commercial paper rather than to retire debt. Id. at 37-41. At several points in its opinion, the bankruptcy court, to buttress its denial of summary judgment, emphasized facts (most of which are disputed) regarding the allegedly unusual nature of Enron's redemption. These include the above-market price Enron paid, the alleged insistence of the broker-dealers to act as intermediaries instead of principals, and the supposed rarity of commercial paper prepayments in general. See, e.g., id. at 37-38.

Alfa and ING sought, and were granted by the district court, interlocutory review of the bankruptcy court's decision denying summary judgment. See In re Enron Creditors Recovery Corp., No. 01-16034, 2009 WL 3349471 (S.D.N.Y. Oct. 16, 2009) ("Enron III"). The district court limited the scope of review to the question whether the § 546(e) safe harbor applies to an issuer's redemption of commercial paper prior to maturity, effected through the customary mechanism of transacting in commercial paper through the Depository Trust Company, without regard to extrinsic facts, such as the motives and circumstances

10

of the redemption.  See In re Enron Creditors Recovery Corp., 422 B.R. 423, 424 (S.D.N.Y. 2009) ("Enron IV").

The district court reversed the bankruptcy court.  It concluded that § 546(e)'s safe harbor protects Enron's redemption payments, and directed entry of summary judgment in favor of Alfa and ING.  Id. at 442.  The district court held (1) that § 741(8)'s definition of "settlement payment" is not limited to payments that are "commonly used," and, therefore, that the circumstances of a particular payment do not bear on whether that payment fits within the definition, id. at 429-34; (2) that a "settlement payment is any transfer that concludes or consummates a securities transaction," id. at 436; and (3) that Enron's redemption constitutes a securities transaction regardless of whether Enron acquired title to the commercial paper, because the redemption involved "the delivery and receipt of funds and securities," id. at 435-42.

Enron appealed to this court.

**DISCUSSION**

On appeal, Enron argues that the bankruptcy court's decision was correct and that the district court erred by holding that settlement payments under § 741(8) are not limited to those that are commonly used in the securities trade and that involve the transfer of title to a security.

"A district court's order in a bankruptcy case is subject to

11

plenary review, meaning that this Court undertakes an independent examination of the factual findings and legal conclusions of the bankruptcy court." In re Duplan Corp., 212 F.3d 144, 151 (2d Cir. 2000). Here, we review only the issue the district court agreed to hear on appeal:

> whether the § 546(e) 'safe harbor' . . . extends to transactions in which commercial paper is redeemed by the issuer prior to maturity, using the customary mechanism of the Depository Trust Company . . . for trading in commercial paper . . . , without regard to extrinsic facts about the nature of the [transactions], the motive behind the [transactions], or the circumstances under which the payments were made.

Enron IV, 422 B.R at 424. As several of our sister circuits have held, the meaning of "settlement payment" under § 741(8) is a matter of statutory construction and thus a question of law we review de novo. See, e.g., In re Comark, 971 F.2d 322, 324-25 (9th Cir. 1992)(citing In re Kaiser Steel Corp., 952 F.2d 1230 (10th Cir. 1991); Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846 (10th Cir. 1990); Bevill, Bresler, & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n, 878 F.2d 742, 745 (3d Cir. 1989)).

**I.  Judicial Interpretation of the Safe Harbor**

Congress enacted § 546(e)'s safe harbor in 1982 as a means of "minimiz[ing] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." Kaiser Steel Corp. v. Charles Schwab & Co., Inc., 913 F.2d 846, 849 (10th Cir. 1990) (quoting H.R. Rep. 97-

12

420, at 2 (1982), reprinted in 1982 U.S.C.C.A.N. 583, 583).  If a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its current securities trading obligations, placing other market participants and the securities markets themselves at risk.

The safe harbor limits this risk by prohibiting the avoidance of "settlement payments" made by, to, or on behalf of a number of participants in the financial markets.  By restricting a bankruptcy trustee's power to recover payments that are otherwise avoidable under the Bankruptcy Code, the safe harbor stands "at the intersection of two important national legislative policies on a collision course–the policies of bankruptcy and securities law."  In re Resorts Int'l, Inc., 181 F.3d 505, 515 (3rd Cir. 1999) (internal quotation marks omitted).

Section 741(8), which § 546(e) incorporates, defines "settlement payment" rather circularly as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."  The parties, following our sister circuits, agree that courts should interpret the definition, "in the context of the securities industry," as "the transfer of cash or securities made to complete [a] securities transaction."

13

Contemporary Indus. Corp. v. Frost, 564 F.3d 981, 985 (8th Cir. 2009) (quoting In re Resorts Int'l, Inc., 181 F.3d at 515).

Although our circuit has not yet addressed the scope of § 741(8)'s definition, other circuits have held it to be "extremely broad." In re QSI Holdings, Inc., 571 F.3d 545, 549 (6th Cir. 2009) (quoting Contemporary Indus. Corp., 564 F.3d at 985). Several circuits, for example, have rejected limitations on the definition that would exclude transactions in privately held securities or transactions that do not involve financial intermediaries that take title to the securities during the course of the transaction. See, e.g., In re Plassein Int'l Corp., 590 F.3d 252, 258-59 (3rd Cir. 2009); In re QSI Holdings, Inc., 571 F.3d at 549-50; Contemporary Indus. Corp., 564 F.3d at 986. No circuit has yet addressed the safe harbor's application to an issuer's early redemption of commercial paper.

Alfa and ING argue that Enron's redemption payments are settlement payments within the meaning of § 741(8) because they completed a transaction involving the exchange of money for securities. The SEC and the Securities Industry and Financial Markets Association, a trade group representing the interests of securities firms, banks, and asset managers, have filed amicus briefs in support of Alfa and ING's interpretation of the statute.

Enron proposes three limitations on the definition of

14

settlement payment in § 741(8), each of which, it argues, would exclude the redemption payments. First, it contends that the final phrase of § 741(8)-"commonly used in the securities trade"-excludes all payments that are not common in the securities industry, including, Enron argues, Enron's redemption. Second, Enron argues that the definition includes only transactions in which title to the securities changes hands. Because, Enron argues, the redemption payments here were made to retire debt and not to acquire title to the commercial paper, they are not settlement payments within the meaning of § 741(8). Finally, Enron argues that the redemption payments are not settlement payments because they did not involve a financial intermediary that took title to the transacted securities and thus did not implicate the risks that prompted Congress to enact the safe harbor.

Because we find nothing in the Bankruptcy Code or the relevant caselaw that supports Enron's proposed limitations on the definition of settlement payment in § 741(8), we reject them. We hold that Enron's redemption payments fall within the plain language of § 741(8) and are thus protected from avoidance under § 546(e).

**II. "Commonly Used in the Securities Trade"**

Section 741(8) defines "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an

15

interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." Enron argues that the phrase "commonly used in the securities trade" modifies all the preceding terms and thereby excludes from the definition all uncommon payments. We disagree.

First, as the district court held, the grammatical structure of the statute strongly suggests that the phrase "commonly used in the securities trade" modifies only the term immediately preceding it: "any other similar payment." Under the "rule of the last antecedent, . . . a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." Barnhart v. Thomas, 540 U.S. 20, 26 (2003); see also Stepnowski v. Comm'r, 456 F.3d 320, 324 n.7 (3d Cir. 2006) ("Under the last-antecedent rule of construction, . . . the series 'A or B with respect to C' contains two items: (1) 'A' and (2) 'B with respect to C.'"). Enron seizes on a corollary rule of construction under which "a modifier . . . set off from a series of antecedents by a comma . . . should be read to apply to each of those antecedents." Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd., 186 F.3d 210, 215 (2d Cir. 1999), abrogated on other grounds as recognized by Sarhank Grp. v. Oracle Corp., 404 F.3d 657, 660 n.2 (2d Cir. 2005). For example, in the phrase "no person shall be deprived of life, liberty, or

16

the pursuit of happiness, without due process of law," the phrase "without due process of law" modifies all three terms.  This rule, however, does not apply to the series in § 741(8) because the modifier is not set off from its antecedents by a comma.  Because both the modifier and its immediate antecedent are set off from the preceding terms in the series, the last-antecedent rule applies.  The phrase "commonly used in the securities industry" thus is properly read as modifying only the term "any other similar payment."  The phrase is not a limitation on the definition of settlement payment, but rather, as our sister circuits have held, it is "a catchall phrase intended to underscore the breadth of the § 546(e) exemption."  In re QSI Holdings, Inc., 571 F.3d at 550 (quoting Contemporary Indus. Corp., 564 F.3d at 986 (emphasis in original)).

Moreover, Enron's proposed reading would make application of the safe harbor in every case depend on a factual determination regarding the commonness of a given transaction. It is not clear whether that determination would depend on the economic rationality of the transaction, its frequency in the marketplace, signs of an intent to favor certain creditors-as suggested by the facts on which the bankruptcy court relied, such as the alleged coercion by Enron's commercial paper noteholders, Enron II, 407 B.R. at 31-or some other factor.  This reading of the statute would result in commercial uncertainty and unpredictability at

17

odds with the safe harbor's purpose and in an area of law where certainty and predictability are at a premium.

Accordingly, we hold that the phrase "commonly used in the securities industry" limits only the phrase immediately preceding it; it does not limit the other transactions that § 741(8) defines as settlement payments.

**III. Redemption of Debt Securities**

Enron next argues that the redemption payments are not settlement payments because they involved the retirement of debt, not the acquisition of title to the commercial paper. We find no basis in the Bankruptcy Code or the relevant caselaw to interpret § 741(8) as excluding the redemption of debt securities. Because Enron's redemption payments completed a transaction in securities, we hold that they are settlement payments within the meaning of § 741(8).

The bankruptcy court agreed with Enron's position, relying in large part on our decision in SEC v. Sterling Precision Corp., 393 F.2d 214 (2d Cir. 1968). See Enron II, 407 B.R. at 37-40. In Sterling Precision Corp., we held that an issuer's redemption of bonds and preferred stock was not a "purchase" within the meaning of the Investment Company Act of 1940. 393 F.2d at 217. We based this conclusion, in part, on the fact that the issuer "did not acquire title to its Debentures or Preferred Stock; it discharged them." 393 F.2d at 216-18. Drawing on this

18

conclusion, the bankruptcy court held that Enron's redemption payments do not constitute settlement payments under § 741(8) because Enron did not acquire title to the commercial paper it redeemed. Enron II, 407 B.R. at 38-40.

Alfa and ING argue that Sterling Precision Corp. is not relevant to this case because it interpreted the Investment Company Act, not the Bankruptcy Code. Setting aside this argument, reliance on Sterling Precision Corp.'s interpretation of the term "purchase" still makes sense only if we read a purchase or sale requirement into § 741(8). For the following reasons, we decline to do so.

Nothing in the text of § 741(8) or in any other provision of the Bankruptcy Code supports a purchase or sale requirement. Enron argues that a "settlement payment" must involve a transaction in securities, which, in turn, must involve a purchase or sale. While we, like our sister circuits, agree that in the context of the securities industry a "'settlement' refers to 'the completion of a securities transaction,'" Contemporary Indus. Corp., 564 F.3d at 985 (quoting Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846, 849 (10th Cir. 1990)), we find little support for the contention that a securities transaction necessarily involves a purchase or sale. Several of the industry definitions of "settlement payment" on which other courts of appeals have relied define the term as an exchange of

19

money or securities that completes a securities transaction; these definitions make no mention of a requirement that title to the securities changes hands.  See, e.g., Kaiser Steel Corp., 913 F.2d at 849 (citing, inter alia, D. Brownstone & I. Franck, The VNR Investor's Dictionary 279 (1981) (defining "settlement" as "finishing up of a transaction or group of transactions"); Group of Thirty, Clearance and Settlement Systems in the World's Securities Markets 86 (1989) (defining "settlement" as "[t]he completion of a transaction, wherein securities and corresponding funds are delivered and credited to the appropriate accounts"); A. Pessin & J. Ross, Words of Wall Street: 2000 Investment Terms Defined 227 (1983) (defining "settlement" as "the completion of a securities transaction")).  While, as the dissent notes, see Dissent at 8-9, Kaiser Steel Corp. also cites industry definitions that reference a purchase or sale of securities, 913 F. 2d at 849, the range of definitions that the decision cites suggests that the securities industry does not universally consider a purchase or sale of securities to be a necessary element of a settlement payment.

Enron argues, and the dissent agrees, see Dissent at 11, 19-20, that applying the safe harbor to Enron's commercial paper redemption would contradict "uniform case law spanning two decades" that allows "avoidance of debt-related payments."  The cases on which Enron relies, however, involve non-tradeable bank

20

loans, not widely issued debt securities. See, e.g., Union Bank v. Wolas, 502 U.S. 151, 152-53 (1991); Ray v. City Bank & Trust Co., 899 F.2d 1490, 1491-93 (6th Cir. 1990); Breeden v. L.I. Bridge Fund, LLC, 220 B.R. 739, 740 (B.A.P. 2d Cir. 1998); CEPA Consulting, Ltd. v. N.Y. Nat'l Bank, 187 B.R. 105, 106-07 (S.D.N.Y. 1995). Concluding that the safe harbor protects payments made to redeem tradeable debt securities does not contradict caselaw permitting avoidance of payments made on ordinary loans. Interpreting the term "settlement payment" in the context of the securities industry will exclude from the safe harbor payments made on ordinary loans.

Indeed, it is not clear that a purchase or sale requirement would necessarily exclude all payments made on ordinary loans. For example, what if parties structured the early repayment of a loan evidenced by a promissory note as a repurchase of that promissory note? The note's terms could prohibit voluntary early redemption. If the borrower were to buy back the promissory note at a negotiated price, it would be difficult to characterize this transaction as a redemption rather than a repurchase in order to exclude it from the safe harbor.

The payments at issue in this case demonstrate the difficulty with and the absence of a statutory foundation for a purchase or sale requirement. Assume, for example, that the terms of Enron's commercial paper–like the terms of the

21

hypothetical promissory note discussed above-prohibited early redemption.  Enron could reacquire the paper only by agreeing with the paper holders on a particular reacquisition price.  This transaction would appear to be a repurchase,[2] cf. Sterling Precision Corp., 393 F.2d at 217 ("[A] maker's paying a note prior to maturity in accordance with its terms would not be regarded as a 'purchase.'" (emphasis added)), and would thus trigger safe-harbor protection under the rule Enron and the dissent espouse.  It is difficult to see, however, why this transaction should warrant safe harbor protection while a transaction identical in every respect, except that the commercial paper's terms did not prohibit early redemption, should not.  Avoidance of the transactions in either scenario would present the same threat of systemic risk in the marketplace, and limiting safe-harbor protection to transactions in the first scenario would not prevent an issuer from making payments to reacquire commercial paper during the preference period.  Contrary to the dissent's contention, see Dissent at 18-19, a purchase or sale requirement would thus not prevent Enron

_____

[2]  Whether the reacquisition of commercial paper at issue in this appeal is properly characterized as a redemption or a repurchase remains an open issue.  See Enron II, 407 B.R. at 45.  Because the district court addressed on appeal only whether the safe harbor protects an issuer's premature redemption of commercial paper, we do not have occasion to address the distinction between a premature redemption and an issuer's repurchase of commercial paper.

from favoring commercial-paper holders over other creditors.

Because we find no basis in the Bankruptcy Code or the caselaw for a purchase or sale requirement, and because we do not think such a requirement is necessary to exclude from the safe harbor repayment of ordinary loans, we decline to impose a purchase or sale requirement on § 741(8).

**IV. Involvement of a Financial Intermediary**

Enron also argues that the redemption of debt does not constitute a protected settlement payment because it did not involve a financial intermediary that took a beneficial interest in the securities during the course of the transaction. Enron argues that the redemption thus did not implicate the systemic risks that motivated Congress's enactment of the safe harbor. Although the role of the broker-dealers that participated in Enron's redemption is a disputed issue of fact, see Enron IV, 422 B.R. at 426, Enron is correct that the DTC acted as a conduit and recordkeeper rather than a clearing agency that takes title to the securities during the course of the transaction.

Nevertheless, we do not think the absence of a financial intermediary that takes title to the transacted securities during the course of the transaction is a proper basis on which to deny safe-harbor protection. The Third, Sixth, and Eighth Circuits rejected similar arguments in affirming application of the safe harbor to leveraged buyouts of private companies that involved

23

financial intermediaries who served only as conduits.  See In re Plassein Int'l Corp., 590 F.3d at 257-59; In re QSI Holdings, Inc., 571 F.3d at 549-50; Contemporary Indus. Corp., 564 F.3d at 986.  In reasoning that provides an analog for us, these courts explained that undoing long-settled leveraged buyouts would have a substantial impact on the stability of the financial markets, even though only private securities were involved and no financial intermediary took a beneficial interest in the exchanged securities during the course of the transaction.[3]  See In re Plassein Int'l Corp., 590 F.3d at 258; In re QSI Holdings, Inc., 571 F.3d at 550; Contemporary Indus. Corp., 564 F.3d at 987.  We see no reason to think that undoing Enron's redemption payments, which involved over a billion dollars and approximately two hundred noteholders, would not also have a substantial and similarly negative effect on the financial markets.

---

[3]     The dissent characterizes these decisions as "stand[ing] for the proposition that, if Section 546(e) applies to a particular type of transaction–namely, purchases of equity securities–an individual transaction does not lose safe-harbor protection simply because it does not involve a central counterparty."  Dissent at 15.  We have difficulty understanding the import of this characterization.  We rely on these decisions as support for rejecting Enron's argument that a transaction must involve a central counterparty to receive safe-harbor protection.  The dissent argues that Congress enacted the safe harbor out of "concern for the stability of central counterparties that guarantee both sides of a securities transaction."  But the dissent does not appear to dispute our, or the Third, Sixth, and Eighth Circuits', rejection of a restriction on the safe harbor that would limit it to transactions involving central counterparties.

24

Moreover, § 546(e) applies to settlement payments made "by or to (or for the benefit of)" a number of participants in the financial markets.  It would appear inconsistent with this language for courts to limit the safe harbor circuitously by interpreting the definition of "settlement payment" to exclude payments that do not involve a financial intermediary that takes title to the securities during the course of the transaction.

In sum, we decline to adopt Enron's proposed exclusions from the definition of settlement payment and the safe harbor.  The payments at issue were made to redeem commercial paper, which the Bankruptcy Code defines as a security.  11 U.S.C. § 101(49)(A)(i).[4]  They thus constitute the "transfer of cash . . . made to complete [a] securities transaction" and are settlement payments within the meaning of § 741(8).  See Contemporary Indus. Corp., 564 F.3d at 985 (quoting In re Resorts Int'l, Inc., 181 F.3d at 515 (3rd Cir. 1999)).  Because we reach this conclusion by looking to the statute's plain language, we decline to address Enron's arguments regarding legislative history, which, in any event, would not lead to a different result.  See Lamie v. U.S.

---

[4]    We reject, as the district court did, Enron's attempt to supplant the Bankruptcy Code's definition of "security" with the definition in the Securities Exchange Act of 1934, which excludes short-term commercial paper.  15 U.S.C. § 78c(a)(10).  This case calls on us to interpret a provision of the Bankruptcy Code.  It makes little sense to look to a definition from a different statutory scheme, particularly when that definition contradicts the Bankruptcy Code's.

Trustee, 540 U.S. 526, 534 (2004) ("It is well established that when the statute's language is plain, the sole function of the courts-at least where the disposition required by the text is not absurd-is to enforce it according to its terms." (internal quotation marks omitted)).

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision reversing the decision of the Bankruptcy Court and directing entry of summary judgment in favor of Alfa and ING.

John G. Koeltl, District Judge, dissenting:

The Court today concludes that Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e), which exempts a "settlement payment" from a bankruptcy trustee's avoidance powers, extends to every transaction in which commercial paper is redeemed by an issuer prior to maturity using the customary mechanism of the Depository Trust Company. Op. at 26-27.

The issue resolved in this case has never been decided previously by any court of appeals. To capture a premature commercial paper redemption within the definition of "settlement payment" in the Bankruptcy Code, the Court broadly defines "settlement payment" to include a payment that "complete[s] a transaction in securities." Op. at 19. A "security" is, in turn, broadly defined under the Bankruptcy Code to include various types of debt such as a note, bond, or debenture. 11 U.S.C. § 101(49)(A). The Court's holding is not required by the opaque definition of "settlement payment" in the Bankruptcy Code, and is inconsistent with the legislative history of that provision. Moreover, the breadth of the Court's definition threatens routine avoidance proceedings in bankruptcy courts. The Bankruptcy Court correctly concluded in this case that the definition of "settlement payment" should include a requirement that there be a purchase or sale of a security to trigger a

1

"settlement payment." See In re Enron Creditors Recovery Corp., 407 B.R. 17, 38-40 (Bankr. S.D.N.Y. 2009). The redemption of commercial paper indisputably is not the purchase or sale of that commercial paper. Because I disagree with the Court's conclusion eliminating this requirement, I respectfully dissent.

## I.

Section 547(b) of the Bankruptcy Code, 11 U.S.C. § 547(b), provides that the trustee of a bankruptcy estate may recover, among other things, money or property transferred by an insolvent debtor in the 90 days preceding bankruptcy, where the transfer (1) was made to or for the benefit of a creditor; (2) was made for or on account of an antecedent debt owed by the debtor; and (3) enabled the creditor to receive more than it otherwise would have under the provisions of the Bankruptcy Code. 11 U.S.C. § 547(b).

Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e), carves out a limited exception to the trustee's avoidance powers, including its power to avoid preferential transfers under Section 547(b). It provides, in relevant part, that:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section . . . 741 of this title, made by or

2

to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency . . . .

11 U.S.C. § 546(e). Section 741 in turn defines "settlement payment" in an ambiguous fashion as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8).

The question the Court confronts today is whether an issuer's redemption of commercial paper prior to maturity is a "settlement payment" within the meaning of Sections 546(e) and 741(8). Op. at 12.[1] It answers this question in the affirmative, based on what it terms "the plain language of § 741(8)." Op. at 16; see also Op. at 26-27. The text of Section 741(8), however, provides virtually no guidance as to the types of transfers that might qualify as settlement payments. The Court understates the severity of this problem by

---

[1] As the Bankruptcy Court noted, commercial paper is a note evidencing a debt, "with a corporation borrowing the money in the marketplace instead of from a bank." Enron, 407 B.R. at 37, 38. Commercial paper with a maturity at the time of issuance of nine months or less is excluded from the definition of a "security" under the Securities Exchange Act of 1934. See 15 U.S.C. § 78c(a)(10).

describing the definition as "rather circular[]." Op. at 14. It is in fact difficult to imagine a more circular, less clear statute than one that defines "settlement payment" by exclusive reference to a variety of types of "settlement payment," and then concludes with a catch-all that refers back to the undefined "settlement payment," namely "any other similar payment commonly used in the securities trade." Thus, while it may be true, as the Court notes, that no provision of the Bankruptcy Code clearly indicates that the redemption of commercial paper is beyond the scope of Section 741(8), see, e.g., Op. at 16, 19, neither does any provision of the Bankruptcy Code clearly indicate that such transactions are within its scope. In other words, the statute is ambiguous.

In light of this statutory ambiguity, other courts of appeals have construed "settlement payment" as a "term . . . of art in the securities trade," which "should be given its established meaning in that industry." Contemporary Indus. Corp. v. Frost, 564 F.3d 981, 985 (8th Cir. 2009) (citing McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 342-46 (1991)). "Specifically, 'settlement' refers to 'the completion of a securities transaction,' and a 'settlement payment is generally the transfer of cash or securities made to complete [the] securities transaction.'" Id. (quoting Kaiser Steel Corp. v.

4

Charles Schwab & Co., 913 F.2d 846, 849 (10th Cir. 1990); In re Resorts, Int'l, Inc., 181 F.3d 505, 515 (3d Cir. 1999) (alteration in original)); see also In re Comark, 971 F.2d 322, 325 (9th Cir. 1992). The parties agree that this is the approach the Court should follow in interpreting "settlement payment," see Op. at 14, but disagree as to whether an issuer's redemption of its commercial paper is a "securities transaction." This question is one of first impression in the courts of appeals.

**II.**

Enron argues persuasively that a "securities transaction" is a term of art in the securities industry that requires a purchase or sale of securities. This industry understanding is reflected in numerous business dictionaries. See, e.g., Barron's Financial Guides, Barron's Dictionary of Finance and Investment Terms 641, 745 (7th ed. 2006) (defining "settlement" as the "conclusion of a securities transaction in which a broker/dealer pays for securities bought . . . or delivers securities sold and receives payment from the buyer's broker"); Thomas P. Fitch, Barron's Dictionary of Banking Terms 423-24 (5th ed. 2006) ("[t]he delivery of securities by a selling

5

broker, and payment by a buying broker"); Group of Thirty, Global Clearing and Settlement: A Plan of Action 13 (2003) ("the process by which the ownership interest in securities is transferred from one investor to another, generally in exchange for a corresponding transfer of funds"); New York Stock Exchange, Language of Investing Glossary 30 (1981) ("[c]onclusion of a securities transaction when a customer pays a broker/dealer for securities purchased or delivers securities sold and receives from the broker the proceeds of a sale"); Bank for International Settlements, Committee on Payment and Settlement Systems & Technical Committee of the International Organization of Securities Commissions, Recommendations for Securities Settlement Systems 48 (2001) ("[t]he completion of a transaction through final transfer of securities and funds between the buyer and the seller").

The existence of a purchase or sale requirement also finds support in case law. See, e.g., In re Bevill, Bresler & Schulman Asset Mgmt. Corp., 878 F.2d 742, 751 (3d Cir. 1989) ("[T]he transfer of record ownership of securities is an integral element in the securities settlement process."). Among the definitions of "settlement payment" that the Kaiser Steel Court relied on was the definition from the New York Stock Exchange's Language of Investing Glossary: The "[c]onclusion of

6

a securities transaction when a customer pays a broker/dealer for securities purchased or delivers securities sold and receives from the broker the proceeds of a sale." Kaiser Steel, 913 F.2d at 849 (quoting New York Stock Exchange, Language of Investing Glossary 30 (1981)). See also 17 C.F.R. 240.17f-1(a)(5) ("The term securities-related transaction shall mean a purpose [sic], sale or pledge of investment securities, or a custodial arrangement for investment securities.").

There appears to be no dispute that an issuer's redemption of its commercial paper does not involve the purchase or sale of a security. Commercial paper is a note evidencing the issuer's debt. As the Court recognizes, this Court has found that an issuer's redemption of its bonds and preferred stock is not a "purchase" within the meaning of the Investment Company Act of 1940. SEC v. Sterling Precision Corp., 393 F.2d 214, 217 (2d Cir. 1968) (Friendly, J.). While the Court reached that conclusion in the context of the Investment Company Act, the Court's reasoning was based on, among other factors, the common understanding of an issuer's repayment of its debt. As Judge Friendly explained, "in common speech a maker's paying a note prior to maturity in accordance with its terms would not be regarded as a 'purchase.'" Id. at 217. Judge Friendly continued: "[T]he normal discourse of lawyers sets redemptions

7

apart from purchases. The distinction is recognized in corporation statutes, . . . ; by judicial decision, . . . ; and by writers on corporation law." Id. The Court today does not dispute this conclusion, but argues that it is irrelevant because the Court declines to "read a purchase or sale requirement into § 741(8)." Op. at 20.

The Court states that it finds little support for a purchase or sale requirement and explains that cases "make no mention of a requirement that title to the securities changes hands." Op. at 21. The Court cites Kaiser Steel and its citation to definitions of "settlement" that make no reference to a change in title to securities. However, Kaiser Steel concerned whether a leveraged buyout transaction was included in the definition of a "settlement payment" in § 741(8). There was no question that the transaction involved the purchase of securities. Moreover, as the Court notes, Kaiser Steel specifically cited other source materials that make clear that a change of title is an integral element of the settlement of a securities transaction. See Kaiser Steel, 613 F.2d at 849 (citing New York Stock Exchange, Language of Investing Glossary 30 (1981)(quoted above); D. Scott, Wall Street Words 320 (1988) (defining "settlement" as the "[t]ransfer of the security (for the seller) or cash (for the buyer) in order to complete a

8

security transaction")).  Kaiser Steel cannot stand for the proposition that no purchase or sale is required for a securities transaction when the transaction at issue did include a purchase and when the Court cited to source materials that identified a purchase as an essential element of a settlement payment.

The Court today points to no case that holds that there is no purchase or sale requirement for a securities transaction, and provides no source that indicates that there is a common industry understanding that the redemption of commercial paper is the completion of a securities transaction.[2]

---

[2] The Court downplays Enron's argument that applying the safe harbor to the redemption of commercial paper would undermine uniform case law that allows the avoidance of debt-related payments.  Op. at 21-22.  But this is not an argument that a purchase or sale requirement is not part of a "securities transaction."  Rather, it is an effort to downplay the significance of the Court's holding.  As explained in Part IV, the Court's distinction is unpersuasive, and the decision will in fact undo decades of well-established law.  It is sufficient at this point to note that the Court's attempt to distinguish prior case law is not an argument why the Court's definition of a securities transaction is in fact correct.

## III.

### A.

The relevant legislative history supports the conclusion that redemptions of commercial paper are not protected by Section 546(e)'s safe harbor. In 1975, Congress amended the Securities Exchange Act of 1934 ("the 1934 Act" or "the Act"), 48 Stat. 881, codified at 15 U.S.C. § 78a et seq., to create a national system for the clearance and settlement of securities transactions. Bradford Nat'l Clearing Corp. v. SEC, 590 F.2d 1085, 1091-92 (D.C. Cir. 1978). The predecessor of Section 546(e) was first enacted in 1978, and applied only to commodities markets. See Kaiser Steel, 913 F.2d at 848-49; H.R. Rep. No. 97-420, at 1-3 (1982). This left open the possibility that the avoidance provisions of Section 547(b) could be applied to the settlement of securities transactions, and the failure to include securities transactions in the settlement safe harbor lent force to the argument that the clearing agencies were not entitled to protection from preference avoidance when they cleared securities transactions. This anomaly inadvertently jeopardized the national settlement system. See Bankruptcy of Commodity and Securities Brokers: Hearings Before the Subcomm.

10

on Monopolies and Commercial Law of the H. Comm. on the Judiciary, 97th Cong. 238-67 (1981) (statement of Bevis Longstreth, Comm'r, SEC).  Clearing agencies were exposed to risk because they were "the critical link between the buyer's broker and the seller's broker"; they "simultaneously guarantee[d]" the delivery of securities to the buyer and the delivery of the purchase price to the seller.  Id. at 245.[3]  In response to this concern, in 1982, Congress adopted substantially the current version of Section 546(e), which more broadly covered settlement payments.  H.R. Rep. No. 97-420, at 2 (1982).[4]

---

[3] The Court's reading of the legislative purpose behind Section 546(e) at times appears substantially broader.  It writes:  "If a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its current securities trading obligations, placing other market participants and the securities markets themselves at risk."  Op. at 13 (emphasis added).  However, this concern could likewise be invoked for refusing to apply the Bankruptcy Code's preference provisions in any context; there is always a risk that the transferee of an avoided transfer will be negatively affected and destabilized by the trustee's exercise of its avoidance powers.  The legislative history indicates that Congress intended to eliminate only a particular subset of claims: those that might jeopardize the stability of clearing agencies.

[4] In 2006, Congress adopted amendments to Section 546(e) that were "technical changes" designed to "update the language to reflect current market and regulatory practices" and to "clarify [] the treatment of certain financial products."  H.R. Rep. 109-

These concerns were not implicated by the market for commercial paper at the time of Section 546(e)'s enactment, and cannot justify the application of the safe harbor to redemptions of commercial paper today.  As an initial matter, the 1934 Act did not, and does not, apply to commercial paper, which is not a "security" for purposes of the Act.  See 15 U.S.C. § 78c(a)(10).[5]

Moreover, Congress's concern for the stability of central counterparties that guarantee both sides of a securities transaction would not justify sweeping redemptions of commercial paper within Section 546(e)'s safe harbor, because transactions in commercial paper are not cleared through such a central counterparty.  As the Court notes, "the DTC acted as a conduit rather than a clearing agency that takes title to the securities during the course of the transaction."  Op. at 24.  Unlike the National Securities Clearing Corporation ("NSCC"), which clears transactions in equity and debt securities covered by the 1934 Act, the DTC does not act as an intermediary for trades by

648, at 2 (2006).  The amendments do not shed any light on whether the premature redemption of commercial paper is covered by the exclusion for a "settlement payment."

[5] The 1934 Act exempts from the definition of security "any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."  15 U.S.C. § 78c(a)(10).

12

undertaking independent obligations to deliver securities to the buyer and payment to the seller.  See Pet Quarters, Inc. v. Depository Trust and Clearing Corp., 559 F.3d 772, 776-77 (8th Cir. 2009).  Rather than act as such a central counterparty, the DTC serves as an electronic bookkeeper that processes payments; it does not guarantee the performance (and assume the risk of non-performance) of any other party.  See id. (explaining that the DTC "tracks transfers of indirect security entitlement positions among its members, eliminating the need to transfer the physical stock certificates," while "NSCC acts as the intermediary between buyer and seller . . . and assumes the rights and obligations of buyers and sellers to receive, pay for, and deliver securities").  Because the DTC does not guarantee the obligations of its members, and does not take title to the securities or funds it clears, it is not exposed to any risk on account of a transaction that is challenged by a bankruptcy trustee.

The Court acknowledges this distinction between the DTC and the NSCC, but rejects it as immaterial on the theory that "the absence of a financial intermediary that takes title to the transacted securities during the course of the transaction is [not] a proper basis on which to deny safe-harbor protection." Op. at 24-25.  In support of this conclusion, it relies on cases

13

from other courts of appeals that have applied Section 546(e)'s safe harbor to leveraged buyouts of companies that "involved financial intermediaries who served only as conduits."  Op. at 25 (citing In re Plassein Int'l Corp., 590 F.3d 252, 257-59 (3d Cir. 2009); In re QSI Holdings, Inc., 571 F.3d 545, 549-50 (6th Cir. 2009); Frost, 564 F.3d at 986).  Accepting the reasoning of the courts of appeals in those cases, however, does not militate in favor of extending Section 546(e)'s safe harbor to transactions in commercial paper.  Those cases stand for the proposition that, if Section 546(e) applies to a particular type of transaction – namely, purchases of equity securities – an individual transaction does not lose safe-harbor protection simply because it does not involve a central counterparty, and thus does not directly implicate the concerns that led Congress to enact the section.[6]  The leveraged buyout cases do not resolve the question the Court must answer in the first instance: whether a different type of transaction – a redemption of commercial paper – is covered by Section 546(e).[7]

---

[6] As the Court points out, the issue on this appeal concerns only an issuer's premature redemption of commercial paper.  Opinion at 23 n.2.

[7] The Court questions any reliance on the fact that Congress enacted the safe harbor out of concern for the stability of central counterparties when various courts of appeals have rejected a restriction on the safe harbor in leveraged buyout

14

**B.**

The conclusion that redemptions of commercial paper are not covered by Section 546(e) is further supported by subsequent legislative history.[8]  Section 547(c)(2) of the Bankruptcy Code provides that a trustee may not avoid under Section 547 a transfer

> to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms.

transactions that do not involve such counterparties.  Op. at 25 n.3.  That is not a basis to ignore the legislative history, which reveals that Congress was primarily concerned with upsetting the securities settlement process.  That settlement process involves the purchase and sale of securities that are ordinarily cleared through a clearing agency.  The fact that some transactions that do not involve a clearing agency – leveraged buyouts – are protected by the safe harbor because they were not carved out by Congress is not a basis for disregarding the legislative history and its focus on transactions involving the purchase and sale of securities.  The Court points to nothing in the legislative history of the ambiguous "settlement payment" provision that indicates that it was intended to cover the redemption of commercial paper.

[8] Subsequent legislative history is not entitled to the same weight as contemporaneous legislative history, but it may provide "some guidance" as to the legislative intent for a prior congressional act.  See Davis v. United Air Lines, Inc., 662 F.2d 120, 123-24 (2d Cir. 1981).

15

11 U.S.C. § 547(c)(2). As originally enacted in 1978, the "ordinary course" defense was restricted to preference actions involving short-term debts of a duration of 45 days or less. See Fidelity Sav. & Inv. Co. v. New Hope Baptist, 880 F.2d 1172, 1175-76 (10th Cir. 1989). In 1984, two years after the passage of Section 546(e), the "ordinary course" defense was amended to eliminate this restriction. A discussion between Senators Dole and DeConcini, as part of the debate surrounding passage of the amendment, makes clear that Congress was primarily concerned with ensuring that "ordinary course" redemptions of commercial paper with longer maturities would come within Section 547(c)(2)'s safe harbor. Id. If, as the Court concludes, Section 546(e) protects every redemption of commercial paper, "without regard to . . . the motives and circumstances of the redemption," Op. at 11, then this amendment was unnecessary because any redemption of commercial paper – whether made in the ordinary course of business or not – would be protected by the "settlement payment" exclusion that Congress had adopted two years before.

16

**IV.**

Enron's reading of Section 546(e) finds further support in the policies reflected in the Bankruptcy Code. In <u>Union Bank v. Wolas</u>, 502 U.S. 151 (1991), the Supreme Court discussed the congressional priorities that motivated enactment of Section 547, and concluded that preference actions under that section are "intended to serve two basic policies":

> A preference is a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankruptcy estate. The purpose of the preference section is two-fold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter "the race of diligence" of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section — that of equality of distribution.

502 U.S. at 160-161 (citing H. R. Rep. No. 95-595 177-178 (1977)).

17

These goals – preventing a "race to the courthouse" and ensuring equality of distribution among creditors – are severely undermined by the interpretation of Section 546(e) adopted by the Court. What Enron alleges happened in this case, according to the Court's interpretation of its papers, is instructive: "it made the redemption payment under pressure from noteholders seeking to recover on their investments amidst rumors of Enron's imminent implosion." Op. at 7. That is, under intense pressure from certain creditors, Enron extinguished its debt by paying to them funds in excess of what they would have received on the open market and, more importantly, far in excess of what they would have received pursuant to the provisions of the Bankruptcy Code. See 11 U.S.C. § 547(b). The scenario depicted by the appellees is no less troubling. They assert, according to the Court, that "Enron redeemed its commercial paper to 'calm the irrational markets' and leave a favorable impression that would allow it to reenter the commercial paper market once 'bad publicity' about the company's stability 'had blown over.'" Op. at 7. Those voluntary debt payments are no different from other efforts of a debtor shortly before bankruptcy to prefer some creditors over others. Such transfers, which result in creditors of equal priority being treated unequally, and which decrease the liquidity of a corporation attempting to avoid a

18

slide into bankruptcy, are at the very core of the trustee's avoidance powers under Section 547.

The Court's holding that a settlement payment requires only the transfer of cash to complete a securities transaction, without any purchase or sale of a security, is indeed extraordinarily broad. In fact, the Court's definition of a settlement payment would seem to bring virtually every transaction involving a debt instrument within the safe harbor of Section 546(e), thus allowing the settlement payment exception to swallow up the Section 547(b) avoidance provision.

The Court concludes that its holding poses no threat to the viability of the Bankruptcy Code's preference provisions on the ground that this case involves "widely issued debt securities," and not "non-tradeable bank loans." Op. at 22. The Court, however, offers no basis for distinguishing between the two types of debts, and under 11 U.S.C. § 101(49)(A), there is none; notes, bonds, and debentures are "securities" under the Bankruptcy Code irrespective of whether they are widely issued or tradeable. The Court's reasoning thus applies equally to any payment on account of a debt evidenced by a writing, and does indeed imperil decades of cases that allow the avoidance of debt-related payments. See, e.g., Wolas, 502 U.S. at 162 (remanding to determine whether payments of long-term debt were

19

within the ordinary course of business exception to avoidance under Section 547(c)(2)).

The Court does not dispute that the payment of any ordinary loan evidenced by a note would fall within its definition of a settlement payment, but the Court finds that "the context of the securities industry will exclude from the safe harbor payments made on ordinary loans." Opinion at 22. The Court cites no authority for this proposition, and the terms of its definition would cover such payments.

The Court's holding is wholly unnecessary. The issue presented in this case is a narrow one – whether the premature redemption of commercial paper by the issuer falls within the safe harbor of a "settlement payment" under section 546(e). The issue is an unusual one, as reflected by the fact that it has never arisen in any prior decision of any court of appeals. However, by eliminating the "purchase or sale" requirement that would exclude such payments, the Court undermines the ability of bankruptcy trustees to avoid preferential payments on account of ordinary debts. The Court argues that including a "purchase or sale" requirement would not "necessarily exclude all payments made on ordinary loans." Opinion at 22. It is not clear why this is an argument against a "purchase or sale requirement," which should be required by the common industry understanding

20

and legislative history of section 546(e). The Court does not dispute that recognizing such a requirement in fact excludes the premature redemption of commercial paper from the scope of the "settlement payment" safe harbor of section 546(e), and does so without imperiling the regular avoidance powers of bankruptcy trustees for ordinary loans. The Court appears to object that the "purchase or sale" requirement would not exclude various ways in which an issuer might deal with its commercial paper. The Court hypothesizes that companies could protect their premature redemptions of commercial paper by turning them into repurchases rather than redemptions, if there is a "purchase or sale" requirement. Opinion at 22-24. But, under the Court's approach, such repurchases would still be covered by the "settlement payment" safe harbor, and, in addition, the Court's approach imperils the ordinary repayment of loans. The fact that the "purchase or sale" requirement would not address all of the ways in which a company might deal with its commercial paper is not a reason to find that premature redemptions of commercial paper do not fall within the "settlement payment" safe harbor.

**CONCLUSION**

For the reasons explained above, I respectfully dissent.

21